**Tiana HUTCHINS, et al., Plaintiffs,**

**v.**

**DISTRICT OF COLUMBIA, Defendant.**

**Civil Action No. 95–2050.**

United States District Court, District of Columbia.

Oct. 29, 1996.

Robert Plotkin, Patricia Hurst, Paul, Hastings, Janofsky & Walker, Washington, DC, for plaintiffs.

Arthur Spitzer, Legal Director, American Civil Liberties Union Fund, Washington, DC.

Marceline Alexander, Assistant Corporation Counsel, D.C., Washington, DC, for District of Columbia.

Steven J. Rosenbaum, Thomas W. Krause, Jason Levine, Covington & Burling, Washington, DC, for amicus American Alliance for Rights and Responsibilities.

Kimberly N. Tarver, Assistant United States Attorney, Washington, DC, for amicus U.S.

## MEMORANDUM OPINION

SULLIVAN, District Judge.

### I.

■ Plaintiffs, a group of minors, parents, and a private business, commenced this action against the District of Columbia ("District") to challenge the constitutionality of the Juvenile Curfew Act of 1995 ("curfew law").[1] D.C.Code Ann. § 6–2182(5). Plain-

---

1. Although the curfew law is entitled the "Juvenile Curfew Act of 1995," this title is somewhat of a misnomer because the law does not apply to juveniles *per se*, but applies only to those individuals who are "minors" as defined by that law. The curfew law defines a "minor" as "any person under the age of 17 years, but does not include a judicially emancipated minor or married minor." *Id.* Nor does the curfew law's definition of minor pertain to the class of motorists under the age of 17 whose rights to operate motor vehicles are affected by the law. In this way, a motorist who is 17 years-old is not, by definition, a "minor" under the curfew law, but is restricted by other provisions of the law, namely those which preclude him or her from

tiffs seek to restrain the District from enforcing the curfew and advance four principal arguments in support of the declaratory and injunctive relief they seek: (1) the curfew law violates the minors' Fifth Amendment equal protection and due process rights to free movement;[2] (2) the curfew law violates the parents' Fifth Amendment due process rights to exercise parental discretion and control over their children; (3) the curfew law is overbroad and unconstitutionally vague in violation of the First Amendment; and (4) the curfew law violates the minors' Fourth Amendment rights to be free from unreasonable searches and seizures.[3] Moreover, the commercial plaintiff, a movie theater with a significant portion of its patrons under the age of seventeen, complains that the curfew law harms its business because many of the theater's screenings end after or shortly before the curfew hour, thus making it near impossible for its young patrons to patronize the theater. The minor plaintiffs' declarations poignantly describe the educational and other activities with which the curfew law interferes.[4]

The District argues that, applying either the rational basis test or the strict scrutiny test, the curfew law is, in either case, constitutional because it is not vague and overbroad and does not infringe upon any due process or fundamental rights of any of the plaintiffs. Moreover, the District claims that the law does not violate equal protection guarantees because it is narrowly tailored to serve the District's compelling interest in: (1) protecting children from becoming victims or perpetrators of crime; (2) assisting parents to exercise their supervisory responsibility over minors; and (3) protecting all per-

operating a motor vehicle when the curfew is in effect. *See* D.C.Code Ann. § 40–301(g). The term "juvenile" is not defined in the curfew law, but is commonly understood to include individuals under 18 years-old. The federal definition for a "juvenile," which is relevant to the arguments set forth in the briefs of the *amicus curiae*, provides that a juvenile is "a person who has not attained his eighteenth birthday...." 18 U.S.C. § 5031 (1996). Therefore, for the sake of clarity, when the Court discusses minors in this Opinion, it is referring to individuals under 17 years old who are not operating motor vehicles. When the Court refers to juveniles, it is referring to individuals under *18 years old*. A copy of the curfew law is set forth in the Appendix to this Opinion.

The curfew law defines the "curfew hours" as "the hours of 11:00 p.m. on any Sunday, Monday, Tuesday, Wednesday, or Thursday, until 6:00 a.m. the following day and from 12:01 a.m. until 6:00 a.m. on any Saturday or Sunday." During July and August, the "curfew hours" extend from "12:01 a.m. until 6:00 a.m." D.C.Code § 6–2182(1); *see also* Def. Prop. Find. of Fact at 2.

**2.** While the Fourteenth Amendment's equal protection clause is by its terms applicable only to the States, the Fifth Amendment's implied equal protection guarantee extends the rights of the equal protection clause of the Fourteenth Amendment to the District of Columbia. *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). *Women Prisoners of District of Columbia Dept. of Corrections v. D.C.*, 93 F.3d 910, 924 (D.C.Cir.1996).

**3.** Because the Court will resolve the issue of the constitutionality of the curfew law on equal protection and due process grounds, the Court need not, and does not, reach the issue of whether the curfew law violates the First and Fourth Amendment rights of the plaintiffs.

**4.** For example, plaintiff Tiana Hutchins, a 16 year-old, believes that the curfew law unreasonably limits her ability to participate in extracurricular activities, such as her modeling assignments. Tiana Hutchins Declaration. Plaintiff Jessica R. Levi, a 16 year-old, explains that the curfew law interferes with her participation in study group sessions with other classmates, which often extend past 11:00 p.m. Jessica R. Levi Declaration. Plaintiff Jacob Remes, a 15 year-old, wants to go out after a school dance, with his parents' permission, to get something to eat with friends. Jacob Remes Declaration. Plaintiff Nicole S. Denny, a 16 year-old, believes that, due to the curfew, she will not be able to attend, as she did last year, a "splash party" hosted by the Prince George's County pool which last year extended past midnight. Nicole S. Denny Declaration.

Plaintiff James Friedman, a 16 year-old, participates in numerous benefit band concerts which normally extend past the curfew hours. James Friedman Declaration. Plaintiff Rachel Schneebaum, a 15 year-old, believes the curfew law interferes with her ability to attend ballet performances that often extend past curfew hours. Rachel Schneebaum Declaration. Plaintiff Michael A. Wittie, a 15 year-old, is an avid competitive swimmer on a private swim team, and the curfew law interferes with his ability to attend swim practices, which begin at 6:00 a.m., and with his ability to walk his dog after curfew hours. Michael A. Wittie Declaration. Finally, plaintiff Anand Singh, a 14 year-old, is a member of his school's debate team, and explains that debate team rounds often last past curfew hours. Anand Singh Declaration.

sons from what it contends are the dangers posed by unsupervised minors out both late at night and during the early morning hours.

Pending before the Court are the parties' cross-motions for summary judgment. The United States Department of Justice[5] and The American Alliance for Rights and Responsibilities (the *"amici"*) have filed *amicus curiae* briefs supporting the District's argument that the curfew law is constitutional. Upon consideration of the undisputed facts, relevant statutory and case law, and the record herein, the Court holds that the curfew law is unconstitutional because it violates the equal protection and due process rights of the minor plaintiffs and the due process rights of their parents. The curfew law is not narrowly tailored to further the compelling interests of the District in protecting District residents. Accordingly, plaintiffs' motion for summary judgment is **GRANTED** and defendant's motion for summary judgment is **DENIED** for the reasons set forth herein.

## II.

On June 20, 1995, the Council of the District of Columbia ("City Council") enacted the curfew law, which the Mayor approved on July 6, 1995. The curfew law took effect, after Congressional review, on September 20, 1995; however, the record does not show that any person or commercial establishment has been prosecuted for violating any provision of this law.[6] Pursuant to the curfew law, persons under seventeen years of age commit an offense if they

[5]. Pursuant to 28 U.S.C. § 517 (1993), an officer of the United States Department of Justice is authorized to attend to the interests of the United States in any pending action. Pursuant to 28 U.S.C. § 519 (1993), the United States Attorney for the District of Columbia is directed to represent the interests of the United States in any litigation in this District Court.

[6]. Although provided with an opportunity by the Court to address the issue of standing, the District has not elected to pursue that issue. For jurisdictional purposes, the Court is satisfied that the plaintiffs have standing to prosecute this case. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990). The plaintiffs have satisfied all three prerequisites for standing: they have "personally

[remain] in any public place or on the premises of any establishment within the District of Columbia after 11:00 p.m. on Sunday through Thursday nights (12:01 a.m. during the months of July and August), or after 12:01 a.m. on Saturday and Sunday.

D.C.Code Ann. § 6–2182(1). The curfew stays in effect until 6:00 a.m. every morning. *Id.*

Indeed, a curfew violation occurs even if the minor is accompanied by a responsible adult who is under age twenty-one and not the minor's parent.[7] *Id.* Thus, parents can not authorize any responsible person under age twenty-one to chaperone their minor children in a public place during curfew hours. The law also prohibits any person under *eighteen* years of age who has a valid District of Columbia driver's license from operating a motor vehicle in the District of Columbia after midnight. *Id.; see also* D.C.Code Ann. § 40–301(g).

In a curfew law prosecution, a pedestrian minor or motorist may assert as a defense that (s)he was:

(1) accompanied by a parent;

(2) on an errand at the parent or guardian's direction without any detour or stop;

(3) in a motor vehicle, train or bus involved in interstate travel;

(4) engaged in employment activity pursuant to "An Act To Regulate The Employment of Minors Within the District of Columbia," approved May 29, 1978, 45

suffered from actual or threatened injury;" the injury can be "fairly traced to the challenged action;" and the injury is "likely to be redressed by a favorable decision." *See Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

[7]. The curfew law defines "parent" as a:

natural parent, adoptive parent or step-parent, or any person who has legal custody by court order or marriage or any person not less than 21 years of age who is authorized by the natural parent, adoptive parent, step-parent or custodial parent of a child to be caretaker for the child.

D.C.Code Ann. § 6–2182(8).

Stat. 998, D.C.Code Ann. § 36–501 *et seq.*, or going to, or returning home from, an employment activity, without any detour or stop;

(5) involved in an emergency;

(6) on the sidewalk abutting his or her house or the next-door neighbor's house and the next-door neighbor has not complained about the minor's presence;

(7) attending an "official school, religious, or other recreational activity" sponsored by the District of Columbia, a civic organization, or another similar entity "that takes responsibility for the minor," or going to, or returning home from, such an activity; or

(8) exercising First Amendment rights under the United States Constitution.

D.C.Code Ann. § 6–2183(b)(1)(A)–(H).

A police officer, who "reasonably believes" that a person is a minor violating the curfew law, is authorized to ask that person's age and the reason for his or her presence in a public place after curfew. *Id.* § 6–2183(c)(1). Based on the person's response and other "circumstances" that are undefined in the curfew law, the police officer is then authorized by the curfew law to take the person into custody and transport him or her to the nearest police station. *Id.* § 6–2183(c)(2). The person then is held in the custody of the Family Services Administration until 6:00 a.m., unless his or her parent or other adult acting *in loco parentis* escorts the minor home. *Id.* § 6–2183(c)(3).

A person under the age of eighteen who violates the curfew law by operating a motor vehicle after midnight may have his or her driving privileges suspended for up to one year. D.C.Code Ann. § 40–301(g). A minor who violates the curfew law shall be adjudicated in the District of Columbia Superior Court. That court may order the minor to perform up to twenty-five hours of community service. *Id.* § 6–2183(d)(4). A parent commits a curfew law offense if he or she "knowingly permits or by insufficient control allows" his or her minor child to violate the curfew law. *Id.* § 6–2183(a)(2). Such offenses are punishable by fines of up to $500, or community service. A parent may also be required by the curfew law to take parenting classes. *Id.* § 6–2183(d)(1), (2).

Moreover, the owner, operator, or any employee of an establishment commits a curfew law offense if he or she knowingly permits or, by insufficient control, allows a minor to remain in any public place or on the premises of that establishment during curfew hours. *Id.* § 6–2183(a)(3). It is a valid defense to prosecution that the owner, operator, or employee promptly notified the police department "that a minor was present on the premises of the establishment during curfew hours and refused to leave." *Id.* § 6–2183(b)(2). A violation of this provision of the law is punishable by a fine not to exceed $500. *Id.* § 6–2183(d)(1).

### III.

 Plaintiffs challenge the constitutionality of the District's curfew law on a number of grounds, including violation of their equal protection and due process rights.[8] An equal protection challenge requires that the Court first determine whether the curfew law "operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny."[9] *San Anto-*

---

**8.** The equal protection clause of the Fourteenth Amendment states, in pertinent part, that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

The due process clause of the Fifth Amendment ensures that no person is "deprived of life, liberty or property, without due process of law." U.S. Const. amend. V.

**9.** To withstand "strict scrutiny," a law must be "necessary to promote a compelling governmental interest" and must be "narrowly tailored" to advance that interest. *Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 1330, 22 L.Ed.2d 600 (1969); *see also Qutb v. Strauss,* 11 F.3d 488, 492 (5th Cir.1993) (applying strict scrutiny to its analysis of the Dallas curfew law); *Dunn v. Blumstein,* 405 U.S. 330, 338–43, 92 S.Ct. 995, 1001–04, 31 L.Ed.2d 274 (1972). Alternatively, under the traditional standard of review, the "rational basis" test, the legislation in question must "bear some rational relationship to legitimate state purposes." *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973).

nio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973); see also Plyler v. Doe, 457 U.S. 202, 216–17, 102 S.Ct. 2382, 2394–95, 72 L.Ed.2d 786 (1982). Plaintiffs argue that the District, through the curfew law, fails to accord the same "equal protection of the laws" to minors under the age of seventeen as is accorded to those persons seventeen and older. Specifically, the plaintiffs contend that the curfew law deprives only members of the former group of their fundamental right to free movement to participate in legitimate nocturnal activities and, therefore, must be reviewed by the Court under the strict scrutiny standard. Moreover, plaintiffs maintain that the curfew law violates the Fifth Amendment due process rights of *all* parents and guardians to make their own private decisions about how to raise their children in a responsible manner.

Although the District maintains that the curfew law would survive a strict scrutiny analysis, it argues that, since no fundamental rights are implicated, the law must be examined under the rational basis test.[10] See San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973). Thus, the Court begins its analysis with the determination of whether the minor plaintiffs have a fundamental right to free movement and whether the fundamental rights of minors' parents' are implicated.

### Fundamental Right to Free Movement

The United States Supreme Court has recognized that the freedom to move about is an important and protected liberty. Papachristou v. City of Jacksonville, 405 U.S. 156, 164, 92 S.Ct. 839, 844, 31 L.Ed.2d 110 (1972). In Papachristou, the Supreme Court struck down a Jacksonville, Florida, vagrancy ordinance and established that "nightwalking," "loafing," or "strolling," while "not mentioned in the Constitution or in the Bill of Rights," are "historically part of the amenities of life as we have known them." Id. at 164, 92 S.Ct. at 844. The Supreme Court added that:

[t]hese unwritten amenities have been in part responsible for giving our people the feeling of independence and self-confidence, the feeling of creativity ... [and] have dignified the right of dissent and honored the right to be nonconformists and the right to defy submissiveness.

Id.

In another case involving a vagrancy statute, Justice Douglas eloquently stated that:

freedom of movement is the very essence of our free society, setting us apart. Like the right of assembly and the right of association, it often makes all other rights meaningful—knowing, studying, arguing, exploring, conversing, observing and even thinking. Once the right to travel is curtailed, all other rights suffer, just as when curfew or home detention is placed on a person.

Aptheker v. Secretary of State, 378 U.S. 500, 520, 84 S.Ct. 1659, 1670–71, 12 L.Ed.2d 992 (1964) (Douglas, J., concurring); see also Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) (holding that a California vagrancy statute "implicates consideration of the constitutional right to freedom of movement"); Kent v. Dulles, 357 U.S. 116, 124, 78 S.Ct. 1113, 1117, 2 L.Ed.2d 1204 (1958) ("Freedom of movement is basic in our scheme of values.").

Significantly, the District of Columbia Circuit has also recognized that freedom of movement on city streets is among the most cherished of our fundamental rights. See Gomez v. Turner, 672 F.2d 134, 143–44 n. 18 (D.C.Cir.1982) ("That citizens can walk the streets, without explanations or formal papers, is surely among the cherished liberties that distinguish this nation from so many others."); see also Waters v. Barry, 711 F.Supp. 1125, 1134 (D.D.C.1989) ("The right to walk the streets, or to meet publicly with one's friends for a noble purpose or for no purpose at all—and to do so whenever one pleases—is an integral component of life in a

---

**10.** Although the curfew law does discriminate on the basis of age, the Court notes that age alone does not define a suspect class. See Gregory v. Ashcroft, 501 U.S. 452, 470, 111 S.Ct. 2395, 2406, 115 L.Ed.2d 410 (1991). Thus, to determine whether the curfew law violates the Fourteenth Amendment, the Court must determine whether the law will infringe upon a fundamental right.

free and ordered society."); *but c.f. Jennings v. Washington,* Case No. 7,284, 5 Cranch C.C. 512, 13 Fed.Cas. 547, 547 (1838) (holding that the District could impose a curfew upon "slaves, free negroes and mulattoes").

■ While it is a well-settled legal principle that the right to free movement is a fundamental right generally, *see id.,* or at least with respect to adults, the parties disagree on whether the Constitution extends this fundamental right· to minors. The courts which have addressed this issue have not reached a consensus. In the first federal case to address the constitutionality of a juvenile curfew ordinance, the Third Circuit—while finding that "[t]he rights of locomotion, freedom of movement, to go where one pleases, and to use the public streets in a way that does not interfere with the personal liberty of others" are fundamental with respect to adults—concluded that these liberties were not "fundamental rights" with respect to minors. *Bykofsky v. Borough of Middletown,* 401 F.Supp. 1242, 1253–58 (M.D.Pa.1975), *aff'd mem.,* 535 F.2d 1245 (3d Cir.1976), *cert. denied,* 429 U.S. 964, 97 S.Ct. 394, 50 L.Ed.2d 333 (1976). The *Bykofsky* court, having concluded that the ordinance did not implicate the minor plaintiff's fundamental rights, proceeded to apply the rational basis test and upheld the ordinance. *Bykofsky,* 401 F.Supp. at 1265–66. Some courts upholding curfew laws have likewise concluded that a minor's right to free movement does not constitute a fundamental right under the Constitution. *See In re J.M.,* 768 P.2d 219, 223 (Colo.1989); *City of Panora v. Simmons,* 445 N.W.2d 363, 369 (Iowa 1989).

Yet, other courts, including the U.S. District Court for the District of Columbia, have departed from the *Bykofsky* reasoning and have held that the Constitution does afford to minors the fundamental right to freedom of movement. *See, e.g., Waters,* 711 F.Supp. at 1134; *City of Milwaukee v. K.F.,* 145 Wis.2d 24, 426 N.W.2d 329, 337 (1988); *Allen v. City of Bordentown,* 216 N.J.Super. 557, 524 A.2d 478 (1987); *see also Qutb v. Strauss,* 11 F.3d 488, 492 (5th Cir.1993) (assuming, without deciding, "that the right to move about freely is a fundamental right").

· Early in this century, in stark contrast to the present, minors were presumed to possess no legal rights. A minor "was neither recognized philosophically nor legally ... as having a right ·to do anything about. the vicissitudes of his life, but only to wait the action of others on his behalf or in his best interests." Patricia M. Wald, *Making Sense Out of the Rights of Youth,* 4 Hum.Rts. 13, 15 (1974). More recently, however, the Supreme Court has rejected that arcane view of minors' rights. In *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 74, 96 S.Ct. 2831, 2843, 49 L.Ed.2d 788 (1976), the Supreme Court maintained that, in general, "constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority." The Supreme Court further noted that "minors, as well as adults, are protected by the Constitution and possess constitutional rights." · *Id.; see also Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 511, 89 S.Ct. 733, 739, 21 L.Ed.2d ·731 (1969).

The Supreme Court has also acknowledged that the State has a great interest in regulating the activities of, and providing protection for, minors. *See Danforth,* 428 U.S. at 74, 96 S.Ct. at 2843; *Ginsberg v. New York,* 390 U.S. 629, 638, 88 S.Ct. 1274, 1279, 20 L.Ed.2d 195 (1968); *see also Carey v. Population Services, Intern.,* 431 U.S. 678, 693 n. 15, 97 S.Ct. 2010, 2020 n. 15, 52 L.Ed.2d 675 (1977). Nevertheless, as set forth herein, this great interest does not automatically dilute the constitutional rights of these minors. Rather, even where the constitutional rights of minors are at issue, the District must narrowly tailor its laws such that these rights are limited in, the least restrictive manner.

The District and the *amici* rely on the *Vernonia Sch. Dist. 47J* case to support their contention that minors do not have a fundamental right of free movement. *See Vernonia Sch. Dist. 47J v. Acton,* —— U.S. ——, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). In *Vernonia,* the Supreme Court held that random urinalysis drug testing of student athletes violates neither the Fourth nor Fourteenth Amendments to the Constitution. The District, as well as the *amici,*

cling to Justice Scalia's statement that "[t]raditionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-determination—including even the right of liberty in its narrow sense, i.e., the right to come and go at will." *Id.* at ——, 115 S.Ct. at 2391.

The District and the *amici* fail to mention, however, that Justice Scalia, writing for the majority, twice noted the important factual context within which that case arose—a context which distinguishes *Vernonia* and precludes its applicability to the present case. Justice Scalia made clear that: "[c]entral to our view of the present case is the fact that the subjects of the Policy are (1) children, who (2) have been committed to the temporary custody of the State as schoolmaster." *Id.* Justice Scalia also emphasized that "[t]he most significant element in this case is the first we discussed: that the Policy was undertaken in furtherance of the government's responsibilities, under a public school system, as guardian and tutor of children entrusted to its care." *Id.* at ——, 115 S.Ct. at 2396. Undoubtedly, the *Vernonia* case involved the limitation of the rights of children while in state custody (as opposed to parental custody) by means of their attendance in their school classrooms. Thus, the District's request that the Court interpret the Supreme Court's decision as implying that minors, even while *not* in the custody of the state, do not have a fundamental right of free movement, invites the Court to read the Supreme Court's decision too broadly. The Court declines to do so.

■■■ The Court is persuaded that minors who are *not* in the custody of the State possess a fundamental right to free movement to participate in legitimate activities that do not adversely impact on the rights of others. *See Planned Parenthood v. Danforth,* 428 U.S. 52, 74, 96 S.Ct. 2831, 2843, 49 L.Ed.2d 788 (1976); *see also Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 511, 89 S.Ct. 733, 739, 21 L.Ed.2d 731 (1969). The Court readily acknowledges, however, that a minor's right to free movement is not without limitations and that, in some circumstances, a minors' right to free

movement will *not* be treated in the same manner as the right of adults. *See Prince v. Massachusetts,* 321 U.S. 158, 170, 64 S.Ct. 438, 444, 88 L.Ed. 645 (1944) (stating that "the power of the [S]tate to control the conduct of children reaches beyond the scope of its authority over adults"); *see also* Note, *Assessing The Scope of Minors' Fundamental Rights: Juvenile Curfews & The Constitution,* 97 Harv.L.Rev. 1163, 1166 (1984). Nonetheless, as recognized previously by this Court, when government undertakes to limit the right to freedom of movement in some manner, "it must act gingerly; it must do so in a manner that is narrowly focused on the harm at hand, as well as sensitive to needless intrusions upon the constitutional interests of the innocent." *See Waters v. Barry,* 711 F.Supp. 1125, 1133 (D.D.C.1989).

■■ In *Bellotti v. Baird,* a case involving a challenge to a Massachusetts statute that required parental consent before a minor could obtain an abortion, the Supreme Court articulated three factors that, when applicable, warrant the differential treatment of minors' constitutional rights: "the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing." 443 U.S. 622, 634, 99 S.Ct. 3035, 3043, 61 L.Ed.2d 797 (1979). Significantly, a number of cases addressing the constitutionality of juvenile curfew statutes have considered the *Bellotti* factors in determining whether the rights of minors and adults should be treated alike in the curfew context. *See Johnson v. City of Opelousas,* 658 F.2d 1065, 1073 (5th Cir.1981); *see also Waters,* 711 F.Supp. at 1136–37; *McCollester v. City of Keene,* 586 F.Supp. 1381, 1385–86 (D.N.H.1984); *but see Qutb v. Strauss,* 11 F.3d 488, 492 n. 6 (5th Cir.1993) (finding it unnecessary to conduct full *Bellotti* analysis when all parties agree that the state's interest in enacting a juvenile curfew ordinance is compelling). A few courts also have applied *Bellotti* to determine whether minors' rights are fundamental. *See In re J.M.,* 768 P.2d 219, 223 (Colo.1989); *City of Panora v. Simmons,* 445 N.W.2d 363, 368–69 (Iowa 1989).[11]

**11.** The courts applying the *Bellotti* analysis to
address the constitutionality of juvenile curfew

Notwithstanding these cases, the District contends that, in light of the Supreme Court's *Vernonia* decision, *Bellotti* is no longer the appropriate framework for assessing the fundamental rights of juveniles in the curfew context. The Court is not persuaded by the District's argument. The Court does not interpret the *Vernonia* decision as standing for the principle of law that minors do not have a fundamental right to engage in the innocuous, legitimate behavior restricted by juvenile curfew laws. Nor does the Court find that the *Vernonia* decision provides an analysis by which this Court can determine whether minor and adult rights should be treated differently. Accordingly, the Court will apply the *Bellotti* analysis in this case to determine whether minors' and adults' rights to free movement should be treated in the same manner, *vel non,* in the context of a curfew analysis.

■ The first *Bellotti* factor to be considered is "the peculiar vulnerability of children." *Bellotti*, 443 U.S. at 634, 99 S.Ct. at 3043. Contrary to the District's claims, the record submitted to this Court does not establish with requisite clarity that the District's minors *under the age of seventeen* are particularly susceptible to becoming victims of crime. It can hardly be contested that the crime and violence which have plagued the District in recent years affect all of the District's citizens, young and elderly alike, with no age distinctions or limitations made for either victims or perpetrators. *See Waters,* 711 F.Supp. 1125, 1137.

The second *Bellotti* factor is the "inability [of children] to make critical decisions in an informed, mature manner." *Bellotti*, 443 U.S. at 634, 99 S.Ct. at 3043. The District argues that the City Council determined that "persons under the age of seventeen are particularly susceptible, because of their lack of maturity and experience, to participate in unlawful and gang-related activities and to be victims of older perpetrators of crime." Def. Prop.Find. of Fact at 14. In *Bellotti,* the Supreme Court reasoned that "the States may validly limit the freedom for children to

choose for themselves in the making of important, affirmative choices with potentially serious consequences." *Bellotti*, 443 U.S. at 635, 99 S.Ct. at 3044. There are, however, significant distinctions between the circumstances in *Bellotti* and the facts and issues surrounding the curfew law considered by this Court. As Judge Richey of this Court pointedly noted in *Waters,* "[t]he decision to either stay inside or roam at night simply does not present the type of profound decision which *Bellotti* would leave to the state." *Waters,* 711 F.Supp. at 1137. This Court concurs.

The final *Bellotti* factor is "the importance of parental control in child-rearing." *Bellotti*, 443 U.S. at 634, 99 S.Ct. at 3043. The District argues that the curfew law's restriction on minors' movement after 11:00 p.m. on weeknights, and 12:00 midnight on weekends, reinforces parental authority and home life, and encourages parents to actively supervise their children. While the Court is well aware that the City Council, in enacting the curfew law, determined that a nocturnal curfew would "[a]id parents and guardians in carrying out their responsibility to exercise reasonable supervision of minors entrusted in their care," D.C.Code Ann. § 6–2181(3), the Court is troubled by the implicit assumption underlying this goal—that parental control over activities of children in the District has regressed to the point where intervention by the City Council must replace the authority and discretion of the District's parents. Neither the District nor any *amicus* has proffered any persuasive evidence to support its argument to the contrary. While some parents in the District undoubtedly have abrogated their parental responsibilities, this Court does not have before it any record evidence that most parents in the District are unable to control or protect their children. Thus, this Court would be remiss in putting its imprimatur on a law that impacts significantly on thousands of its law-abiding citizens based upon a mere assumption that a *majority* of the District's parents require the

ordinances have not reached a consensus on the appropriate application of the factors. Other courts have applied the *Bellotti* test to determine

whether the state's interests are compelling. *See, e.g., Allen v. City of Bordentown,* 216 N.J.Super. 557, 524 A.2d 478, 486 (1987).

city government to second guess their parenting decisions.

Having applied the *Bellotti* factors, the Court is not persuaded that, in the context of a curfew law, there are legitimate grounds for treating minors' fundamental right to free movement differently from those of adults. Accordingly, the Court concludes that the District's curfew law must be examined under the strict scrutiny standard.

### Fundamental Right of Parents to Direct Their Children's Upbringing

The Court is also of the opinion that the strict scrutiny standard is implicated by the curfew law's intrusion upon parents' Fifth Amendment rights to direct their children's upbringing. *See Bellotti*, 443 U.S. at 639 n. 18, 99 S.Ct. at 3046 n. 18. Given the guarantee of a "constitutional parental right against undue, adverse interference by the State" into family matters, the District can not advance a plausible argument to the contrary. *Id.* The District and *amici* contend that any infringement upon parental rights is "minimal" and does not render the curfew law unconstitutional. As the plaintiffs note, however, the District and the *amici*, without citation to any controlling authority, "invite this Court to draw the extraordinary conclusion that *every* parent who allows his or her child to be away from home during curfew hours without the supervision of an adult over twenty-one has, *ipso facto*, 'abdicate[d] parental authority,' is guilty of 'neglect,' and has failed in the 'exercise of parental responsibilities.'" Def.Mem. at 35; U.S. Mem. at 25.

The declarations filed by parents in this case poignantly demonstrate that, under the curfew law, parents may not choose to allow their minor children to see a movie, participate in an athletic or artistic activity, or enjoy some other educational activity, even with their permission or even if the minor is accompanied by a family friend or older sibling who is mature and responsible but has not reached the age of twenty-one. Moreover, parents may not permit their children to participate in early morning sports practices; ask their children to walk pets early in the morning; or permit their children to return from a friend's home after late night

studying. These intrusions into the authority of parents to make reasonable rules for their children, and to teach their children to mature into responsible and self-reliant adults are an infringement upon parental liberty that also demands the highest degree of review that the Constitution allows. Accordingly, in light of the curfew law's powerful impact on the constitutional rights of minors and adults, the Court will examine the District's curfew law under the strict scrutiny standard.

### Strict Scrutiny

▮ To survive strict scrutiny, the curfew law must be "necessary to promote a compelling interest" and be "narrowly tailored" to advance that interest. *See Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 1330, 22 L.Ed.2d 600 (1969). The Court is persuaded that, in enacting the curfew law, the City Council was motivated by a compelling governmental interest in protecting juveniles and other persons. The crime and violence which have plagued the District in recent years affect all of the District's citizens, young and old alike. However, the record presented to this Court does *not* establish that the District's minors are more likely than adults to be victims or perpetrators of criminal acts. Nevertheless, generally speaking, the District has a great interest in reducing juvenile crime and victimization and ensuring minors' matriculation into productive adult citizens. Thus, the Court concludes that, in enacting the curfew law, the District was motivated by a compelling interest to reduce juvenile crime and victimization. *See Waters*, 711 F.Supp. at 1139.

The second prong of the strict scrutiny analysis, however, is problematic for the District. Although the District has shown that it has a compelling interest in protecting juveniles and other persons, the District has failed to demonstrate that its curfew law is narrowly tailored to further that interest.

As the Fifth Circuit in *Qutb* recognized:

[t]o be narrowly tailored, there must be a nexus between the stated government interest and the classification created by the ordinance. This test "ensures that the means chosen 'fit' this compelling goal so

closely that there is little or no possibility that the motive for the classification was illegitimate."

*Qutb,* 11 F.3d at 493 (internal citation omitted) (quoting *City of Richmond v. J.A. Croson, Co.,* 488 U.S. 469, 493, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989)). In other words, to survive a strict scrutiny analysis, there must be some evidentiary nexus between the juvenile crime and victimization problems and the curfew. In the Court's view, no such evidentiary nexus exists on the record assembled before it.

The District contends that the purpose of the curfew law is (1) to reduce the likelihood that minors will be the victims or perpetrators of criminal acts during the curfew hours; and (2) to aid parents or guardians in carrying out their responsibility to exercise reasonable supervision of minors entrusted to their care. D.C.Code Ann. § 6–2181(e)(1)–(3). Further, the District claims that the law is narrowly tailored for two reasons: (1) the statistical data presented to the Court addresses the compelling state interest in reducing juvenile crime and victimization, and (2) the curfew law's eight statutory defenses allow the District to accomplish its goals through the least intrusive means. The Court will address each proffered reason.

The District argues that the following statistical data supports the constitutionality of the curfew law. First, the District relies upon the 1995 *Kids Count Data Book,* which ranks the fifty states and the District of Columbia in terms of juvenile crime and records state profiles of children's well-being in various categories. According to this book, between 1985–1992, the District was the jurisdiction with the highest juvenile violent crime arrest rate per 100,000 youth. Second, the District relies upon a report by the United States Department of Justice, Office of Juvenile Justice and Delinquency Prevention, which reports that in 1992, 1.55 million violent crimes were committed against juveniles nationally, ages twelve through seventeen. Third, the District relies upon the data from Federal Bureau of Investigation's ("FBI") Uniform Crime Reporting Program which show that nationally, juvenile arrests increased between 1988 and 1992 at a rate greater than the arrest rate for adults. Fourth, the District relies upon information in the District of Columbia Courts' Annual Reports from 1990 to 1994. These reports, the District argues, show an increase in the number of new juvenile referrals in both the area of "Acts Against Persons," and "Persons in Need of Supervision." All of these statistics, the District contends, show an increase in juvenile arrests in the District over the past several years. Fifth, the District also relies upon statistical data from other cities [12] with curfews, which arguably demonstrate a decrease [13] in juvenile crime and victimization after enactment of a curfew law. It is significant to note that the record does not show that *any* of this statistical data was ever submitted to or considered by the City Council *prior* to its enactment of the curfew law.

While the District and *amici* submit to the Court a plethora of statistics that address juvenile crime and victimization in other cities, they present only scant statistical information on crime in the District committed by and against minors under the age of *seventeen.* Moreover, those statistics that actually do address juvenile crime and victimization in the District are flawed. First, the statistics refer to juveniles, which includes those persons under the age of *eighteen.* Since the District's curfew law applies to minors, defined as those under the age of *seventeen,* these statistics are overinclusive, and hence, do not address how, if at all, the curfew law is narrowly tailored to further the District's compelling interest in protecting minors under the age of seventeen. Another flaw is that the statistics are not broken down to show the time of day or night an incident occurred and the ages of the perpetrators or victims.

---

**12.** These cities include New Orleans, Louisiana; Dallas, Texas; and San Antonio, Texas.

**13.** For example, statistics from Dallas, Texas, demonstrate that after a six-month review of that city's curfew law, the city recorded a 15.7% decrease in juvenile arrests and a 21.7% decrease in violent juvenile arrests. Similarly, statistics from San Antonio, Texas, showed a 60.11% decrease in juvenile victimization during curfew hours, and the city realized a 76.99% decrease in juvenile victimization the following year.

Finally, the District contends that these statistics indicate a decrease in juvenile arrests by comparing the period July 7, 1995, through September 30, 1995, with the same period in 1994. As plaintiffs maintain, however, and the Court concurs, the District has failed to account for other possible variables in arrest statistics other than the alleged effectiveness of the curfew law. For example, the District readily admits that fewer police officers were on the police force in 1995 than in 1994. Fewer overall officers could, in the Court's view, naturally result in fewer overall arrests. Moreover, the budget of the Metropolitan Police Department ("MPD") has diminished and limitations have been placed on police overtime pay. These factors may have also contributed to fewer arrests. Plaintiffs also presented uncontroverted expert testimony corroborating current statistics which indicate that most juvenile crimes and victimization occur in the afternoons and decline throughout the day. In this regard, a large percentage of these events occur at home, and involve family, friends and acquaintances; such incidents are also unlikely to be impacted by the curfew. Finally, the District ignored available statistics that show that more than ninety percent of all juveniles committed no crimes at all and were not arrested at night or any other time. According to the FBI's 1992 National Crime Statistics, it appears that less than one-half of one percent of juveniles were arrested at any time for violent offenses, and only five percent were arrested for any offense.

Nevertheless, the Court is persuaded that the statistical data provided by the District and the *amici* show a disturbing incidence of juvenile [14] crime and victimization across the Nation. As will be demonstrated, however, the vast majority of this information does not persuade the Court that a factual predicate exists on the record before it to warrant the imposition and intrusion of a nocturnal curfew law in the District that would prohibit thousands of law-abiding minor citizens, from

being on the streets, in public places, or on the premises of a privately-owned business in the District, during curfew hours. Further, the litigation proceedings before the Court, which enabled the parties and the Court to proceed on a record developed over several months, highlight the failure of these statistics to support the District's argument that: (1) the curfew law is narrowly tailored to serve the government's interest in the least intrusive manner; and (2) an evidentiary nexus exists between the curfew law and the juvenile crime such that the curfew law survives strict scrutiny.

For example, during the hearing on the cross-motions for summary judgment in April of this year, the Court inquired about the statistical data the City Council relied upon in enacting the curfew law. In response, the District's counsel referenced the *Kids Count Data Book* and recited the statistics about the District provided by this publication. Notwithstanding counsel's representations, the legislative history of the curfew law of 1995 is silent with respect to the City Council's consideration of either this book or the statistics set forth therein. The Court then asked the District's counsel whether these serious crimes, referenced in the book, were committed during the curfew hours, to which the attorney responded: "[t]he breakdown did not break down curfew hours." Transcript ("Tr.") at 39, lines 22–25. In response to the Court's question: "isn't that significant," the District's counsel answered: "certainly it is significant." *Id.* Later during the motions hearing, the Court addressed this issue further and the following exchange ensued:

Court: All right, so the City Council considered that evidence and ... what else?

Counsel: They considered juvenile victimization and crime statistics provided by the FBI which document and reflect that the District of Columbia has serious problems in the area of juvenile crime.

Court: During the curfew hours?

---

**14.** As previously mentioned, a "juvenile" is defined as "a person who has not attained his *eighteenth* birthday," 18 U.S.C. § 5031 (1996) (emphasis added), as opposed to a minor, which the curfew law affects directly and defines as

"any person under the age of *seventeen* years, but does not include a judicially emancipated minor or married minor." D.C.Code Ann. § 6–2182(5) (emphasis added).

Counsel: Across-the-board.

Court: During the curfew hours. I'm just asking you for a straightforward answer.

Counsel: No, Your Honor.

Tr. at 45, lines 12–23.

Moreover, the District places primary and significant reliance on a chart entitled "Juvenile Arrest Statistics for the Period January 1, 1993 through February 23, 1995 During Curfew Hours."[15] According to the District, this chart, which apparently *was* presented to the City Council prior to the enactment of the curfew law, purports to indicate that the number of juvenile arrests during curfew hours was more than half of all juvenile arrests for two years.

Arguably, that chart is the District's most persuasive statistical support for its curfew law. In the Court's opinion, however, the District's statistical evidence set forth on the chart is woefully deficient for a number of reasons. First, the chart records juvenile arrests, and as mentioned previously, is over-inclusive because it reports activity of minors older than seventeen years of age. Second, the chart is undated. Third, the lack of corroboration from either the author of this chart, or someone familiar with the methodology used to prepare the chart, makes it impossible for the Court to credit these statistics as reliable. Fourth, and extremely problematic, is the fact that no one knows who prepared this chart. At oral argument the Court inquired of the District's counsel regarding the origin of this chart. The following exchange took place:

Court: Where did that information come from, though?

Counsel: It was provided by the Metropolitan Police Department.

Court: Who provided it?

Counsel: The districts, the police districts provided it and put in together in one chart.

Court: I'm sorry. Who prepared that chart?

Counsel: I don't have the name of the individual that prepared the chart.

Tr. at 42, lines 24–25; at 43, lines 1–8.

Later during the hearing the Court asked:

Court: Is it a fair statement to say that we don't know the identity right now of the person who prepared it?

Tr. at 43, lines 24–25, at 44, line 1.

Counsel for the District responded: "That is correct."

Tr. at 44, line 2.

Therefore, the persuasiveness of this chart is undermined, indeed if not lost, by the District's inability to produce any information surrounding the manner in which the chart was prepared. Moreover, during the discovery phase of this litigation, the plaintiffs made repeated attempts to ascertain the identity of the person or persons who prepared this chart in order (1) to conduct further discovery into the manner in which the information was gathered and reported and (2) to test the reliability of that information.[16] In the Court's view, the District's reliance upon an undated chart, prepared by an unknown author, under circumstances that are also mysterious, to say the least, strains credulity.

Amazingly, the District also relies on other statistics produced during discovery that actually *contradict* the chart and statistics previously discussed. A comparison of the arrest charts supplied in the record[17] by the District shows that in one year there were allegedly more arrests for certain offenses during the six to eight hours proposed for

---

**15.** Def.Disc.Exh. at DC 039.

**16.** After a recess during oral argument, the District's counsel attempted to inform the Court of the identity of someone who may have prepared the chart in question. The Court would not allow discovery to be supplemented in such a manner. *See* Fed.R.Civ.P. 26(e)(1) ("A party is under a duty to supplement at appropriate intervals its disclosures under subdivision (a) if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."). After the Court took the case under advisement, the District did not renew its effort to inform the Court and plaintiffs of the identity of the person who prepared the chart.

**17.** Def.Disc.Exh. at DC 246 and DC 258.

the curfew than there were for those same offenses during the entire twenty-four hours of the day—a mathematical impossibility that the District has made no effort to explain.

Furthermore, not one shred of evidence exists in the record before this Court, nor did it exist before the City Council, to support the curfew law's restriction on motorists under the age of eighteen. During the motions hearing, the following exchange occurred:

Court: What's the basis for restricting the activity of the seventeen year-old motorist? What study was conducted?

Counsel: Your Honor, I don't have that information before me.

Court: All right, then I can safely assume there is no evidence, right?

Counsel: I understand.

Court: There's nothing in the record to support the restrictions on the activities of seventeen year-old motorists. A fair statement or not?

Counsel: A fair statement.

Tr. at 56, lines 5–17.[18]

This Court is mindful that the District is not required to, nor has this Court demanded that, the District produce "scientifically certain criteria of legislation." *See Ginsberg v. New York,* 390 U.S. 629, 642, 88 S.Ct. 1274, 1282, 20 L.Ed.2d 195 (1968). Nevertheless, in the absence of either a fact-finding hearing on juvenile crime and victimization or a public debate on alternative proposals, the record must demonstrate more than mere questionable reliance, by the City Council, upon a hodge-podge of national, as opposed to local, statistics, other cities' statistics, unverifiable charts, and statistics for people *over* the age of seventeen, *before this Court permits the District to truncate the fundamental rights of minor persons* **under** *the age of seventeen,* who want to engage in legitimate nighttime activities.

This point is underscored by the District's substantial reliance on *Qutb v. Strauss,* 11 F.3d 488 (5th Cir.1993). As the District readily admits, and as discovery taken in this case supports, the District adopted wholesale the Dallas, Texas, juvenile ordinance that

withstood scrutiny in *Qutb.* The problem with the District's adoption of that ordinance, however, is that the District did not—and could not—also adopt wholesale the evidentiary statistics that allowed the Dallas ordinance in *Qutb* to withstand constitutional scrutiny.

The deposition testimony of Sally Weinbrom, staff member to Council-member Harold Brazil, is illustrative of this point. The curfew law materialized when Ms. Weinbrom was asked by Mr. Brazil to draft the curfew law; Ms. Weinbrom did not consider alternatives to the curfew legislation. Rather than draft curfew legislation herself, she requested a copy of, and relied upon, the Dallas, Texas curfew. Although Ms. Weinbrom attempted to gather statistics from the Justice Department, the Metropolitan Police Department and the Department of Human Services regarding juvenile crimes or victimization during curfew hours, none of the agencies she contacted were able to provide her with the necessary information.

Moreover, although Ms. Weinbrom reviewed some arrest statistics which were maintained by hour of day and relied upon those statistics to show the presence of violent crimes during curfew hours, she admitted that these statistics do not distinguish between juvenile and adult arrests. According to Ms. Weinbrom, she was able to "extrapolate" from crime statistics she was given that it was "more likely" that certain crimes occurred during certain hours. The statistics Ms. Weinbrom was able to compile on juvenile arrests, victimization rates, and crimes during curfew hours were not part of the Report of the Judiciary Committee of the D.C. City Council on the curfew and have neither been produced in discovery nor relied upon by the District.

Finally, Ms. Weinbrom testified that, at the time she drafted the curfew law, she had no data supporting imposition of a curfew at 11:00 p.m. and 12:00 a.m., rather than earlier or later in the evening. Nor, according to Ms. Weinbrom, did she have any information that would support the conclusion that juve-

---

18. Nor did the District offer any evidence whatsoever to support the extension of the curfew to virtually every private establishment in Washington, D.C.

niles are safer or less likely to commit crimes during the activities listed as defenses in the curfew legislation.

In *Qutb*, the city of Dallas, Texas, offered the following competent statistical evidence to support enactment of its curfew:

1. Juvenile crime increases proportionally with age between ten years and sixteen years old.
2. In 1989, Dallas recorded 5,160 juvenile arrests, while in 1990 there were 5,425 juvenile arrests. In 1990 there were forty murders, ninety-one sex offenses, 233 robberies, and 230 aggravated assaults committed by juveniles. From January 1991 through April 1991, juveniles were arrested for twenty-one murders, thirty sex offenses, 128 robberies, 107 aggravated assaults, and 1,042 crimes against property.
3. Murders are most likely to occur between 10:00 p.m. and 1:00 a.m. and most likely to occur in apartments and apartment parking lots and streets and highways.
4. Aggravated assaults are most likely to occur between 11:00 p.m. and 1:00 a.m.
5. Rapes are most likely to occur between 1:00 a.m. and 3:00 a.m. and sixteen percent of rapes occur on public streets and highways.
6. Thirty-one percent of robberies occur on streets and highways.

*Qutb*, 11 F.3d at 493.

The statistics offered by the District, unlike those presented to the *Qutb* court, do not demonstrate that the curfew law is narrowly tailored to support the District's compelling interest in responding to crime. In a colloquy with the Court, the District's counsel admitted that the type of information considered by the *Qutb* court may be available to the District:

> Court: It's been a few years since I was on the Superior Court bench and I'm trying to recall whether or not certain information is available in the social files. My recollection is that in the social files for juveniles who are detained because of criminal activity—I guess new referrals—in those social files, there is infor-

> mation with respect to the time of arrest for what juvenile; there is information with respect to the time the offense was allegedly committed. Am I correct?

> Counsel: That's correct, Your Honor.

> Court: All right. Why didn't the City Council attempt to get that sort of information in a redacted form; that is not necessarily a disclosure of the name of the individual involved, but a disclosure of that type of information which conceivably could have been persuasive to a legislative branch in determining whether there's a need for a curfew or not? Was that ever considered?

> Counsel: Your Honor, I'm not sure, when consideration was given to the enactment of the juvenile curfew, that the Police Department had the capacity to manually go through each and every document to make a determination.

> Court: But you agree that the information is available, though?

> Counsel: Certainly, that information could be made available.

Tr. at 48, lines 14–25; at 49, lines 1–13.

The District also argues that the curfew law is narrowly tailored because the law contains eight statutory defenses that allow minors to be on the streets or in a public or private place during the curfew hours without violating the curfew law. Given the District's lack of a factual predicate for the curfew law, however, the Court is not convinced that the defenses enable the curfew law to withstand strict scrutiny. Moreover, the "First Amendment Activity" defense, the "Responsible Entity" defense, the "Sidewalk" defense, and the "Emergency" defense fail to withstand constitutional scrutiny. In the Court's view, they are woefully vague and undefined to the extent that even the District and the *amici* offer varying interpretations and constructions of what is acceptable and unacceptable conduct. Further, the curfew law neither defines these defenses in any detail, nor references any regulations that explain the type of conduct that falls within the purview of the defenses. Surely, if the District and its *amici* cannot agree upon reasonable interpretations of the statutory

defenses to a law that directly impacts constitutional rights, the minors, parents and other citizens whose liberty interests are affected by its enforcement would hardly be in a better position to know what is protected.

Moreover, although the District and *amici* argue that any unconstitutional defenses should be severed from the law, in the Court's view, this proposal is not workable because it is impossible for the Court to conclude that the City Council would have enacted the curfew law without any of the enumerated defenses. *See Espresso, Inc. v. District of Columbia,* 884 F.Supp. 7 (D.D.C. 1995). By severing any of the defenses, the Court would effectively, and impermissibly, rewrite the curfew law. It is beyond the jurisdiction of this Court to engage in such an exercise.\

### IV.

Criminal activity in the District of Columbia poses a serious threat to the health, safety, and the exercise of liberties for minors and adults, alike. In the opinion of the Court, however, the District has failed to show that prohibiting minors under the age of seventeen from being in public, *during curfew hours,* and engaged in legitimate activities not adversely impacting the rights of others, furthers the District's interest in reducing their criminal activity as well as victimization. Nor does the record presented to this Court justify the wholesale nullification of the fundamental right to freely move about for the thousands of law-abiding minors of the District, under the age of seventeen, who are engaged—or may desire to become engaged—in legitimate nighttime activities that ·do not adversely impact on the rights of others. In the Court's view, this legislation was not narrowly tailored by the City Council to sanction the government's erosion of one of the most comprehensive and valued liberty interests afforded citizens of a civilized society—the cherished freedom of movement. Thus, the Court concludes that the curfew law directly and impermissibly burdens the Fourteenth and Fifth Amendment liberty interests of the thousands of law-abiding minors who reside in or who may visit the District of Columbia.

Moreover, the curfew law's intrusion into the private domain of thousands of families in the District of Columbia is violative of the Fifth Amendment rights of all parents and custodians—including those who are fulfilling their responsibilities to make decisions for their minor children and to raise their children in a responsible manner. Were this Court to sustain the constitutionality of the present curfew law—on the inadequate record assembled before it—the Court would impose wholesale custodial control over *all* young people either residing in or visiting the District and also erode the Supreme Court's principle that "deeply rooted in our Nation's history and tradition [of individual liberty], is the belief that the parental role implies a substantial measure of control over one's children." *Bellotti,* 443 U.S. at 638, 99 S.Ct. at 3045. Accordingly, the Court will not sanction the District's substantial intrusion into the private domain of the family and the rights of parents to make appropriate decisions for their minor children and to raise their children in a responsible manner.

As fundamental rights of minors and their parents are involved in this case, and since the record before the Court does not support the conclusion that the curfew law was narrowly tailored by the City Council to serve in the least intrusive manner the District's compelling interest in addressing crime and victimization by and against minors, the Court must declare as unconstitutional the District of Columbia's "Juvenile Curfew Act of 1995."

In light of the foregoing, the Court concludes that the "Juvenile Curfew Act of 1995" is not narrowly tailored to serve a compelling interest in the least restrictive manner.

### V. CONCLUSION

Plaintiffs' motion for summary judgment is **GRANTED.** Defendant's motion for summary judgment is **DENIED.** An Order will issue with this Opinion.[19]

---

**19.** Since the Court holds that the curfew law is unconstitutional on equal protection and due process grounds, the Court need not reach the remaining issues of whether the curfew law must be struck down on First or Fourth Amendment grounds.

Codification
District of Columbia Code
(1996 Supplement)

AN ACT

D.C. ACT 11–90

IN THE COUNCIL OF THE DISTRICT
OF COLUMBIA

July 6, 1995.

To establish a curfew for juveniles under the age of 17 years in the District of Columbia, to

provide for parental responsibility for implementation of the act, to provide for exceptions to the act and to amend the District of Columbia Traffic Act of 1925 to impose driving restrictions on minors.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this act may be cited as the "Juvenile Curfew Act of 1995".

Sec. 2. Findings and purpose.

(a) The Council of the District of Columbia ("Council") has determined that there has been an increase in juvenile violence, juvenile gang activity, and crime by persons under the age of 17 years in the District of Columbia.

(b) The Council has determined that persons under the age of 17 years are particularly susceptible, because of their lack of maturity and experience, to participate in unlawful and gang-related activities and to be the victims of older perpetrators of crime.

(c) The Council has an obligation to provide for the protection of minors from each other and from other persons, for the enforcement of parental control over, and responsibility for, children, for the protection of the general public, and for the reduction of the incidence of juvenile criminal activities.

(d) The Council has determined that a curfew for those under the age of 17 years will be in the interest of the public health, safety, and general welfare and will help to attain these objectives and to diminish the undesirable impact of this conduct on the citizens of the District of Columbia.

(e) The Council determines that passage of a curfew law will protect the welfare of minors by:

(1) Reducing the likelihood that minors will be the victims of criminal acts during the curfew hours;

(2) Reducing the likelihood that minors will become involved in criminal acts or exposed to narcotics trafficking during the curfew hours; and

(3) Aiding parents or guardians in carrying out their responsibility to exercise reasonable supervision of minors entrusted to their care.

Sec. 3. Definitions.

For the purposes of this act, the term:

(1) "Curfew hours" means from 11:00 p.m. on any Sunday, Monday, Tuesday, Wednesday, or Thursday, until 6:00 a.m. on the following day, and from 12:01 a.m. until 6:00 a.m. on any Saturday or Sunday. During the months of July and August, the term "curfew hours" means from 12:01 a.m. until 6:00 a.m.

(2) "Emergency" means an unforeseen combination of circumstances or the resulting state that calls for immediate action. The term "emergency" includes, but is not limited to, a fire, a natural disaster, an automobile accident, or any situation that requires immediate action to prevent serious bodily injury or loss of life.

(3) "Establishment" means any privately-owned place of business operated for profit to which the public is invited, including, but not limited to, any place of amusement or entertainment.

(4) "Guardian" means a person who, under court order, is the guardian of the person of a minor or a public or private agency with whom a minor has been placed by the court.

(5) "Minor" means any person under the age of 17 years, but does not include a judicially emancipated minor or a married minor.

(6) "Narcotic trafficking" means an act of engaging in any prohibited activity related to narcotic drugs or controlled substances as defined in the District of Columbia Uniform Controlled Substances Act of 1981, effective

682

August 5, 1981 (D.C. Law 4–29; D.C.Code § 33–501 *et seq.*).

(7) "Operator" means any individual, firm, association, partnership, or corporation that operates, manages, or conducts any establishment. The term "operator" includes the members or partners of an association or partnership and the officers of a corporation.

(8) "Parent" means a natural parent, adoptive parent or step-parent, or any person who has legal custody by court order or marriage, or any person not less than 21 years of age who is authorized by the natural parent, adoptive parent, step-parent or custodial parent of a child to be a caretaker for the child.

(9) "Public place" means any place to which the public, or a substantial group of the public, has access, and includes, but is not limited to, streets, highways, and the common areas of schools, hospitals, apartment houses, office buildings, transport facilities, and shops.

(10) "Remain" means to linger or stay or fail to leave the premises when requested to do so by a police officer or owner, operator, or other person in control of the premises.

(11) "Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

Sec. 4. Curfew authority; defenses; enforcement and penalties.

(a)(1) A minor commits an offense if he or she remains in any public place or on the premises of any establishment within the District of Columbia during curfew hours.

(2) A parent or guardian of a minor commits an offense if he or she knowingly permits, or by insufficient control allows, the minor to remain in any public place or on the premises of any establishment within the District of Columbia during curfew hours.

(3) The owner, operator, or any employee of an establishment commits an offense if he or she knowingly allows a minor to remain upon the premises of the establishment during curfew hours.

(b)(1) It is a defense to prosecution under this act that the minor was:

(A) Accompanied by the minor's parent or guardian;

(B) On an errand at the direction of the minor's parent or guardian, without any detour or stop;

(C) In a motor vehicle, train, or bus involved in interstate travel;

(D) Engaged in an employment activity pursuant to An Act To regulate the employment of minors within the District of Columbia, approved May 29, 1928 (45 Stat. 998; D.C.Code § 36–501 *et seq.*), or going to, or returning home from, an employment activity, without detour or stop;

(E) Involved in an emergency;

(F) On the sidewalk that abuts the minor's residence or that abuts the residence of a next-door neighbor if the neighbor did not complain to the Metropolitan Police Department about the minor's presence;

(G) In attendance at an official school, religious, or other recreational activity sponsored by the District of Columbia, a civic organization, or another similar entity that takes responsibility for a minor, or going to, or returning home from, without any detour or stop, an official school, religious, or other recreational activity supervised by adults and sponsored by the District of Columbia, a civic organization, or another similar entity that takes responsibility for a minor; or

(H) Exercising First Amendment rights protected by the United States Constitution, including free exercise of religion, freedom of speech, and the right of assembly.

(2) It is a defense to prosecution under subsection (a)(3) of this section that the owner, operator, or employee of an establishment promptly notified the Metropolitan Police Department that a minor was present on the premises of the establishment during curfew hours and refused to leave.

(c)(1) Before taking any enforcement action under this section, a police officer shall ask the apparent offender's age and reason for being in the public place. The officer shall not issue a citation or make an arrest under this section unless the officer reason-

ably believes that an offense has occurred and that, based on any response and other circumstances, no defense in subsection (b) of this section is proffered or is present.

(2) If a police officer determines that a minor is committing a curfew offense, the police officer shall take the minor to the nearest Police District headquarters or substation or other area designated by the Metropolitan Police Department.

(3) A minor who violates this act shall be detained by the Metropolitan Police Department at the nearest available Police District headquarters or substation or other area designated by the Metropolitan Police Department and released into the custody of the minor's parent, guardian, or an adult person acting in loco parentis. The minor's parent or an adult person acting in loco parentis with respect to the minor shall be called to the Police District headquarters or substation or other designated area to take custody of the minor. A minor who is released to a person acting in loco parentis with respect to the minor shall not be taken into custody for violation of this act while returning home with the person acting in loco parentis. If no one claims responsibility for the minor, the minor may be taken to the minor's residence or placed in the custody of the appropriate official at the Family Services Administration of the Department of Human Services and, subsequently, released at 6:00 a.m. the following morning.

(d)(1) Any adult who violates a provision of this act is guilty of a separate offense for each day, or part of a day, during which the violation is committed, continued, or permitted. Each offense, upon conviction, is punishable by a fine not to exceed $500 or community service.

(2) Parents or persons in loco parentis of the minor may, upon each conviction for violating this act, be required to complete parenting classes pursuant to the Prevention of Child Abuse and Neglect Act of 1977, effective September 23, 1977 (D.C.Law 2–22, D.C.Code § 6–2101 et seq.) or title 16 of the District of Columbia Code.

(3) When required by section 16–2302, charges brought under this act shall be transferred to the Family Division of Superior Court of the District of Columbia.

(4) A minor adjudicated in violation of this act by the Family Division of the Superior Court may be ordered to perform community service of up to 25 hours for each violation.

(e)(1) The Mayor shall report to the Council, not less than 90 days prior to the expiration of this act, on the curfew's effectiveness and shall recommend that the curfew either be continued or discontinued.

(2) The Mayor shall include the following in the report required by this subsection:

(A) The number of minors detained and the number of persons fined as a result of a violation of this act;

(B) The number of criminal homicides and other narcotic trafficking related crimes of violence committed during the time that this act is in effect by age of persons involved and by time of day;

(C) The number of minors injured during curfew hours as a result of crime and the cause of each injury; and

(D) The District's net cost of enforcing the ordinance.

Sec. 5. Driving restrictions for minors.

Sec. 6. (a) This act shall take effect after a 30–day Congressional review following approval by the Mayor (or in the event of a veto by the Mayor, action by the Council of the District of Columbia to override the veto) as provided in section 602(c)(1) of the District of Columbia Self–Government and Governmental Reorganization Act, approved December 24, 1973 (87 Stat. 813; D.C.Code § 1–233(c)(1)), and publication in either the District of Columbia Register, the District of Columbia Statutes–at–Large, or the District of Columbia Municipal Regulations.

(b) This act shall expire 2 years after its effective date.

Section 7 of the District of Columbia Traffic Act of 1925, approved March 3, 1925 (43 Stat. 1121; D.C.Code § 40–301), is amended by adding a new subsection (g) to read as follows:

"(g) No person under the age of 18 who has a valid District of Columbia drivers license shall operate a motor vehicle in the District of Columbia after midnight, except as provided in section 4 of the Juvenile Curfew Act of 1995. Violation of this section is punishable by the suspension of driving privileges for a period not to exceed 1 year."

Chairman
Council of the District of Columbia

Mayor
District of Columbia

APPROVED: July 6, 1995

### ORDER

Upon consideration of plaintiffs' Motion for Summary Judgment, defendant's Motion for Summary Judgment, the briefs of the *amici*, the points and authorities in support of and in opposition to same, and the arguments of counsel, it is this 29th day of October, 1996, hereby

**ORDERED** that, for the reasons set forth in the Opinion of the Court issued on this date, the plaintiffs' Motion for Summary Judgment is **GRANTED;** and it is further

**ORDERED** that, for the reasons set forth in the Opinion of the Court issued on this date, the defendant's Motion for Summary Judgment is **DENIED;** and it is further

**ORDERED** that the District of Columbia's "Juvenile Curfew Act of 1995" shall be, and hereby is, declared unconstitutional, void and unenforceable; and it is further

**ORDERED** that the District of Columbia and each of its agents, servants and employees, and all persons acting under its direction or in concert with it, are hereby permanently restrained and enjoined from implementing and enforcing in any manner the terms of the District of Columbia's "Juvenile Curfew Act of 1995."

**IT IS SO ORDERED.**