Daniel SCHLEIFER, et al., Plaintiffs,

v.

**CITY OF CHARLOTTESVILLE,**
Defendant.

**Civil Action No. 97–0021–C.**

United States District Court,
W.D. Virginia,
Charlottesville Division.

April 30, 1997.

Deborah Chasen Wyatt, Wyatt & Carter, Charlottesville, VA, Mary Catherine Bauer, ACLU of Virginia Foundation, Richmond, VA, for plaintiffs.

W. Clyde Gouldman, III, Deputy City Attorney, Charlottesville, VA, Lisa Robertson Kelley, City Attorney's Office, Charlottesville, VA, for defendant.

### MEMORANDUM OPINION

MICHAEL, District Judge.

This case involves an attack on a recently enacted curfew law by Defendant City of Charlottesville, Virginia; the court has been asked to issue preliminary injunctive relief against the curfew law pursuant to Fed. R.Civ. P. 65(a). After holding a hearing on the matter and considering the parties' oral arguments, memoranda, and evidentiary exhibits, the court concludes that it must presently decline to enjoin the law's operation.

In dealing with any preliminary injunction request, the court is acutely aware of the potential for mischief in acting on such a request. The guiding principles are perhaps best expressed by a case from the Fourth Circuit Court of Appeals where Judge Wilkinson stated: "[G]ranting a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way.

1. Among the plaintiffs are children below the age of seventeen, an eighteen year old, and their parents. Throughout its opinion, the court will

'[T]he danger of a mistake' in this setting 'is substantial.'" *Hughes Network Systems v. InterDigital Communications Corp.*, 17 F.3d 691, 693 (4th Cir.1994) (quoting *American Hosp. Supply Corp. v. Hospital Prods., Ltd.*, 780 F.2d 589, 593 (7th Cir.1986)). It is particularly difficult to reach reasoned conclusions on what must necessarily be an incomplete and sometimes unbalanced record.

■ "Where serious issues are before the court, it is a sound idea to maintain the *status quo ante litem* ...." *Feller v. Brock*, 802 F.2d 722, 727 (4th Cir.1986) (citing *Blackwelder*, 550 F.2d at 194–95). When the injunction that would alter the status quo is mandatory (as opposed to prohibitory), the district court should "sparingly exercise[ ]" its authority. *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir.1980).

It is important to note with clarity that the observations and conclusions stated herein are based on an incomplete record and cannot represent any final decision on any one of the claims. The court will expatiate on the law involved in these various issues, but does so with the clear recognition that a full evidentiary basis may change entirely the view of the court as to any one of these issues. It is to be hoped that some or all of the observations in this opinion will give guidance to counsel in developing that full evidentiary record. Again, the court cautions that the observations concerning plaintiffs' claims are made on the basis of that incomplete record about which Judge Wilkinson warned.

### I. THE CURFEW LAW

Plaintiffs, represented by the American Civil Liberties Union ("ACLU"), are juveniles and their parents [1] who request preliminary injunctive relief from Section 17–7 of Chapter 17 of the Charlottesville City Code, which enacts the curfew law (effective March 1, 1997). The purpose of the law is to

(I) promote the general welfare and protect the general public through the reduction of juvenile violence and crime within the City; (ii) promote the safety and well-

not distinguish between these different groups expressly, because the context will make apparent which group's rights are at issue.

being of the City's youngest citizens, ... whose inexperience renders them particularly vulnerable to becoming participants in unlawful activities, particularly unlawful drug activities, and to being victimized by older perpetrators of crime; and (iii) foster and strengthen parental responsibility for children.

*See* Introduction to § 17–7.

The law, applicable to children under the age of seventeen, sets a curfew of 12:01 a.m. to 5:00 a.m. on Mondays through Fridays and 1:00 a.m. to 5:00 a.m. on Saturdays and Sundays. During these hours, children are not permitted "to remain in or upon any Public Place within the City, to remain in any motor vehicle operating or parked therein or thereon, or to remain in or upon the premises of any Establishment within the City ..." *Id.* § 17–7(b). Parents are prohibited from aiding violations of the law. *Id.* § 17–7(c). Eight exceptions are provided. Minors are not bound by the curfew when: (1) they are accompanied by parents; (2) they are out because of an emergency; (3) they are engaged in employment activity, leaving from such activity, or going to such activity; (4) they are directly outside of their residences where their parents reside; (5) they are attending activities supervised by an adult and sponsored by a school, religious organization, civic organization, public agency, or a similar organization; (6) they are on an errand on behalf of their parents and have an appropriate authorizing note; (7) they are engaging in interstate travel; or (8) they are exercising rights under the First Amendment, such as free exercise of religion, speech, or assembly. *Id.* § 17–7(b)(1)–(8). A minor who violates the curfew law but who has never before received a warning will receive only a warning from an enforcing police officer. *Id.* § 17–7(g)(1)(A)(1). However, a minor who has previously received a warning will be charged with violating the curfew law and will be issued a summons to appear in court for the violation. *Id.* § 17–7(g)(1)(A)(2). The law directs the arresting officer to release the child into the custody of a parent as soon as is practicable or to place the child into a temporary care facility, so that a parent can retrieve the child. *Id.* § 17–7(g)(1)(B).

## II. SUMMARY OF PLAINTIFFS' ARGUMENTS AGAINST THE CURFEW LAW

Plaintiffs argue that the curfew law infringes upon various rights guaranteed them under the United States Constitution, such as freedom of movement and freedom from undue government interference in child-rearing, both of which derive from the Due Process Clause of the Fourteenth Amendment;[2] rights guaranteed under the First Amendment;[3] the Fourth Amendment;[4] and the Equal Protection Clause of the Fourteenth Amendment.[5] Further, plaintiffs contend the curfew law is void for vagueness because its defenses (or exceptions) give insufficient guidance to plaintiffs and enforcement officials as to which activities are exempt from the curfew law.

The following are activities of which the juvenile plaintiffs claim they will be deprived during curfew hours: (1) going to City Council meetings; (2) attending concerts and movies (such as Star Wars and The English Patient); (3) socializing with friends at coffee houses and dance parties ("raves"); (4) participating in band or theater activities; (5)

**2.** The Due Process Clause of the Fourteenth Amendment provides that no person shall be deprived of "life, liberty, or property, without due process of the law." U.S. Const. amend. IV.

**3.** The First Amendment prohibits Congress from making any "law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend I. The First Amendment was made applicable to the states through the Fourteenth Amendment;

the same is true of the Fourth Amendment. *See* Laurence H. Tribe, American Constitutional Law § 11–2 (2d ed.1988).

**4.** The Fourth Amendment guards against "unreasonable searches and seizures" and warrants not based on "probable cause." U.S. Const. amend. IV.

**5.** The Fourteenth Amendment's Equal Protection Clause states that no person shall be denied "equal protection of the laws." U.S. Const. amend. IV.

eating; and (6) swimming and ice skating. Although plaintiffs speculate that other activities, such as late-night church and Alcoholics Anonymous meetings are threatened by the curfew law, none of the plaintiffs claim to be late-night church goers or recovering alcoholics.

## III. STANDARD GOVERNING PRELIMINARY INJUNCTIONS

 The following articulation of the law on preliminary injunctions is taken, virtually verbatim, from this court's opinion in *Betts v. Rector & Visitors of the University of Virginia*, 939 F.Supp. 461, 465 (W.D.Va. 1996). Plaintiffs' motion for a preliminary injunction is governed by the test articulated in *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189, 196 (4th Cir. 1977), pursuant to which the court must take into account four factors, the weight given to each to be determined by the strength of the other factors. First, the court must make a finding that plaintiffs will suffer irreparable injury if the court declines to grant injunctive relief. After this determination has been made, the court must assess the likelihood of harm to defendant if the court issues an injunction against it and then balance this harm against the injury plaintiffs will suffer if they are denied injunctive relief. Subsequently, the court must establish that plaintiffs are likely to succeed on the merits, or if the balance in the previous step clearly favors plaintiffs, the court need only satisfy itself that plaintiffs have raised substantial and serious questions on the merits. Finally, public interest must be considered in the analysis. *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir.1994) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812–13 (4th Cir.1991)).

## A. LIKELIHOOD OF SUCCESS ON THE MERITS

Because the merits of plaintiffs' case will, in large part, determine where the remaining *Blackwelder* factors lie, the court will first address the likelihood that plaintiffs will succeed on their claims.

Most of the challenges to curfew laws have taken place at the state level. However, two recent important decisions discussing the constitutionality of curfew laws come from federal courts-one from the district court in the District of Columbia, *Hutchins v. District of Columbia*, 942 F.Supp. 665 (D.D.C. 1996), and the other from the Fifth Circuit Court of Appeals, *Qutb v. Strauss*, 11 F.3d 488 (5th Cir.1993). These cases are luxurious precedent, for both analyze curfew laws almost identical to the curfew law under attack before this court. *Hutchins* struck down the curfew law, based upon a conclusion that the law infringed the constitutional rights of minors and their parents; the latter were found to have been unconstitutionally deprived of their right to rear children without undue governmental interference, and the former were found to have been unconstitutionally constrained in their right of free movement. The Fifth Circuit in *Qutb*, in contrast determined that the curfew law should be upheld; the Fifth Circuit concluded that any infringement on the rights of parents was minimal and that the constraint on the free movement rights of minors was justifiable. The court finds both cases helpful, and, although the court agrees with the conclusion reached by the Fifth Circuit, the court does not follow the precise analysis of *Qutb*. The court holds, for the reasons stated below, that plaintiffs are unlikely to succeed on the merits of any their claims and that plaintiffs have not raised serious or substantial questions on the merits of their claims.

## 1. STANDARD OF REVIEW FOR CONSTITUTIONAL CHALLENGE

 Most laws passed by Congress are reviewed under the "rational basis" test, also known as the "roll-over-and-play-dead" test, because so long as the challenged legislation "bear[s] some rational relationship to legitimate state purposes," and there is some reasonable basis for the classification, courts will uphold the legislation. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 40, 93 S.Ct. 1278, 1284, 36 L.Ed.2d 16 (1973). If, however, a law "operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution," strict scrutiny

judicial review is required. *Id.* at 17, 93 S.Ct. at 1288; *Plyler v. Doe,* 457 U.S. 202, 216–17, 102 S.Ct. 2382, 2394–95, 72 L.Ed.2d 786 (1982).[6] To survive strict scrutiny, the classification must (1) promote a compelling government interest and (2) be narrowly tailored to that interest. *Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969). A law is narrowly tailored if it employs the least restrictive means to achieve its goal, *Qutb,* 11 F.3d at 492, and if there is an evidentiary nexus between the government's compelling interest and the classification. *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).

◼ To the extent that the constitutional rights of children—and not adults—are implicated by a given law, the above analysis does not necessarily govern. This is because constitutional protections accorded children and adults have never been co-extensive. *See Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, ——, 115 S.Ct. 2386, 2391, 132 L.Ed.2d 564 (1995) (Scalia, J.) ("Traditionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-determination-including even the right of liberty in its narrowest sense, i.e., the right to come and go to will."); *Ginsberg v. New York,* 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (Brennan, J.). Of course, constitutional protections are not triggered only when an individual comes of age, and children, like other people, indisputably have rights under the Constitution. *See Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 74, 96 S.Ct. 2831, 2843, 49 L.Ed.2d 788 (1976). Thus, in *Bellotti v. Baird,* 443 U.S. 622, 633, 99 S.Ct. 3035, 3042–43, 61 L.Ed.2d 797 (1979), the Supreme Court struck down a state statute requiring a minor to procure parental consent before obtaining an abortion, because that statute unduly burdened a minor's constitutional right to abortion. In reaching this conclusion, however, the Supreme Court was careful to conduct an analysis tailored to the age of the burdened group, rather than simply applying the same strict scrutiny standard governing laws infringing fundamental rights of adults. Bending to the dictates of common sense, the Supreme Court recognized that the behavior of minors may be constitutionally regulated more stringently than that of adults. The Court in *Bellotti* explained that "the constitutional rights of children cannot be equated with those of adults" because of "[ (1) ] the peculiar vulnerability of children; [ (2) ] their inability to make critical decisions in an informed, mature manner, and [ (3) ] the importance of the parental role in child rearing." *Id.* at 634, 99 S.Ct. at 3043. In articulating these factors, *Bellotti* drew upon *Ginsberg,* 390 U.S. at 634–43, 88 S.Ct. at 1277–83, and *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), both of which manifested a willingness to permit states greater regulatory leeway based on the special status of children in our society. In *Ginsberg,* the Supreme Court sanctioned a law that, if applied to adults, would have violated the First Amendment; a law criminalizing sale of sexually explicit magazines to minors survived constitutional challenge, even though the same law could not have been constitutionally applied to adults. 390 U.S. at 634, 88 S.Ct. at 1277. Justice Brennan, speaking for the Court, explained that the state must be permitted to adjust its laws to "social realities," *id.* at 638, 88 S.Ct. at 1279 (internal quotations and citations omitted), i.e. that children simply cannot be treated exactly the same as adults. Hence, the Court reiterated that "the power of the state to control the conduct of children reaches beyond the scope of its authority over adults." *Id.* (internal quotations and citations omitted). Similarly, in *Prince,* the Supreme Court upheld the conviction of an adult who violated a child-labor statute by permitting a willing child (her ward) to sell religious literature on the street. Of course, a law categorically prohibiting adults from distributing religious literature would not have passed constitutional muster. *Id.* at 167, 64 S.Ct. at 442–43. "But," cautioned the Court, "the mere fact that a state could not wholly prohibit this form of adult activity,

---

**6.** A lower level of scrutiny, intermediate scrutiny, is applied to certain classifications, for instance ones based on sex. *See, e.g., Michael M. v. Supe-* *rior Court,* 450 U.S. 464, 468, 101 S.Ct. 1200, 1204, 67 L.Ed.2d 437 (1981).

... does not mean it cannot do so for children." *Id.* at 168, 64 S.Ct. at 443. The opposite conclusion

> would mean that a state could impose no greater limitation upon child labor than adult labor. Or, if an adult were free to enter dance halls, saloons, and disreputable places generally, in order to discharge his conceived religious duty to admonish or dissuade persons from frequenting such places, so would be a child with similar convictions or objectives, if not alone then in the parent's company, against the state's command.

*Id.*

Although Supreme Court precedent makes clear that children and adults may be treated differently under the Constitution, the doctrinal implications of this difference remain unsettled. *See Hutchins,* 942 F.Supp. at 672 & n. 11 (citing different ways in which courts have applied *Bellotti* ). Some courts have held that certain fundamental rights constitutionally guaranteed adults are not fundamental when it comes to minors, *see In re J.M.,* 768 P.2d 219, 223 (Colo.1989); *City of Panora v. Simmons,* 445 N.W.2d 363, 368 (Iowa 1989); other courts have applied *Bellotti* to determine whether the state interest is compelling, *see Allen v. City of Bordentown,* 216 N.J.Super. 557, 524 A.2d 478, 486 (1987); *cf. Qutb,* 11 F.3d at 492 n. 6; still other courts have held that a state could impinge upon fundamental rights of minors if its interest was "significant," but not necessarily compelling, *see In the Matter of the Appeal In Maricopa County,* 181 Ariz. 69, 887 P.2d 599, 605 (App.1995); *cf. Johnson v. City of Opelousas,* 658 F.2d 1065, 1073 (5th Cir. Unit A Oct.1981).

■ After examining these various methods, the court concludes that the most sensible approach, and one most closely aligned with the Supreme Court's reasoning, is simply to accord the state more regulatory latitude in governing children in certain circumstances. When the *Bellotti* factors (the minor's vulnerability, inexperience in decisionmaking, or need for parental guidance) cut in favor of increased state oversight, the state's burden of proof should be somewhere below that required by strict scrutiny

review (i.e., a showing that the challenged law is narrowly tailored to a compelling state interest). Lowering the standard of review—rather than denying the existence of a bare right—conforms to the Supreme Court's general equal protection analysis as well as the Court's statements regarding state regulation of minors. The Supreme Court generally seems to presume that the guarantees of the Bill of Rights may be invoked by all people; this presumption accords with the constitutional text, which does not restrict its protections to isolated groups of individuals. Yet the presumption of equal treatment under the Constitution is somewhat diluted by the sliding scale of scrutiny employed by the Supreme Court, depending on the characteristics of the individual seeking constitutional protection. For instance, race-based classifications face the toughest battle (strict scrutiny); distinctions based on gender are examined somewhat less closely (intermediate scrutiny); and laws that benefit one age group over another receive little serious attention. *See* Laurence H. Tribe, American Constitutional Law §§ 16–1 to 16–25 (2d ed.1988). The Supreme Court has given some indication that laws impinging on constitutional rights of minors should be analyzed in a similar fashion. In *Bellotti,* the Court remarked that "although children are protected by the same constitutional guarantees ... the State is entitled to adjust its legal system to account for children's vulnerability." 443 U.S. at 635, 99 S.Ct. at 3044. In practical terms, this means that the "test ... [should be] less rigorous than the 'compelling state interest' test applied to restrictions on the ... [constitutional] rights of adults ....[l]esser scrutiny is appropriate both because of the States' greater latitude to regulate the conduct of children, ... and the law has generally regarded minors as having a lesser capability for making important decisions." *Carey v. Population Servs., Int'l,* 431 U.S. 678, 693 n. 15, 97 S.Ct. 2010, 2020 n. 15, 52 L.Ed.2d 675 (1977) (citations omitted). Thus, "[s]tate restrictions inhibiting the ... rights of minors are valid only if they serve 'any significant state interest ... that is not present in the case of an adult.'" *Carey,* 431 U.S. at 693, 97 S.Ct. at 2020 (quoting

*Danforth,* 428 U.S. at 75, 96 S.Ct. at 2844). Thus, "significant interest" displaces "compelling interest." The court takes "lesser scrutiny" also to mean that instead of requiring that the restriction be narrowly tailored, courts should ensure that there be a substantial fit between means and ends. *Cf. Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976) (stating that a gender classification will be upheld only if it serves an "important governmental objective[ ]" and is "substantially related to achievement of [that] objective[ ]").

### a. THE *BELLOTTI* FACTORS APPLY HERE

■ Plaintiffs, supported by the district court in the District of Columbia, which applied strict scrutiny review, *see Hutchins,* 942 F.Supp. at 672–74, argue that the *Bellotti* factors should not affect the level of scrutiny in this context. The court must part company with the court in *Hutchins,* as it appears clear to this court that the *Bellotti* factors justify a less stringent standard of review in this case. As to the first *Bellotti* factor, the Supreme Court has already affirmed what most parents must know: "possible harms arising from ... activities subject to all diverse influences of the street" pose more danger to children than to adults. *Prince,* 321 U.S. at 168, 64 S.Ct. at 443. Even though "children have rights, in common with older people, in the primary use of highways. .... in such use streets afford dangers for them not affecting adults." *Id.* at 169, 64 S.Ct. at 443. Of course, youth below the age of seventeen are more vulnerable to night life—and the assaults, drugs, and sex that go with it—than adults. No statistical evidence need be presented to "prove" this point, for it is common knowledge and common sense. Children are peculiarly vulnerable to the dangers of the night hours during which the curfew law is in effect.

In addition to the first *Bellotti* factor, the second *Bellotti* factor-children's inability to make critical decisions in an informed matter-also justifies imposition of a lower burden of proof upon the government. The court cannot accept plaintiffs' argument that leaving their homes after curfew hours does not qualify as a critical decision within the meaning of *Bellotti.* Of course, on an isolated night, a decision to go out after curfew hours may not be a critical decision, but rather one of minimal importance; but that decision, made night after night, might have an adverse effect on a child's life. Without the curfew, children may well choose to roam the City streets nightly, thus endangering their lives (or the lives of others), exposing themselves to insidious blandishments, and losing sleep to the detriment of their scholarly studies. Given these possible consequences, the court believes the decision to leave one's doorstep, seemingly superficial, may actually be crucially important.

Finally, the importance of the parental role in child-rearing, the third *Bellotti* factor provides yet another reason for the court to review the curfew law with more leniency. Plaintiffs view the curfew as an unwelcome intrusion into the relationship between parent and child and, consequently, urge that, if anything, the third *Bellotti* factor cuts against employing anything but strict scrutiny review. Unfortunately, the court believes that plaintiffs take too rosy a view of the parent-child relationship in America today. The court agrees with Charlottesville's legislative body (which represents the City's citizens) that the curfew supplies parents with a tool to reinforce their authority. *See Maricopa County,* 887 P.2d at 607 (finding, based on its experience, that curfew laws provide badly needed support for parents). Even if, however, the curfew law intrudes upon parental authority, the former two *Bellotti* factors (alone or together) clearly support a standard of review that is less demanding than strict scrutiny.

### 2. FREEDOM OF MOVEMENT

■ Freedom of movement, "basic in our scheme of values," *Kent v. Dulles,* 357 U.S. 116, 124, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204 (1958), is a fundamental right guaranteed adults by the Constitution. *See, e.g., Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *Papachristou v. City of Jacksonville,* 405 U.S. 156, 164, 92 S.Ct. 839, 844, 31 L.Ed.2d 110 (1972). There has been some disagreement as to

whether freedom of movement is a fundamental right for minors. *Compare Hutchins,* 942 F.Supp. at 672 (holding that minors who are not in the possession of the state have a fundamental right to free movement), *with Bykofsky v. Borough of Middletown,* 401 F.Supp. 1242, 1253–58 (M.D.Pa.1975) (applying the rational basis test to a claim that the rights of free movement had been restricted by a curfew targeting minors), *aff'd mem.,* 535 F.2d 1245 (3d Cir.1975). As discussed above, the court will assume minors have the same right to free movement as do adults. Further, the court accepts plaintiffs' contention that the curfew law impinges upon their right to free movement. Hence, the only remaining issue is whether the law will likely survive the applicable standard of review, which standard is less stringent than strict scrutiny. This question is easy for the court, because the court finds that the infringement on minors' rights to freedom of movement would likely pass constitutional muster even under strict scrutiny review. For the benefit of a future reviewing court, the court conducts a strict scrutiny review analysis (though it holds that the curfew law need not pass this stringent standard of review to survive plaintiffs' challenge).

### a. COMPELLING INTEREST

Protecting the safety and well-being of children and reducing juvenile crime are unquestionably compelling state interests.[7] *See e.g., Qutb,* 11 F.3d at 492 (quoting *Hodgson v. Minnesota,* 497 U.S. 417, 444, 110 S.Ct. 2926, 2941–42, 111 L.Ed.2d 344 (1990) ("[The state] has a strong and legitimate interest in the welfare of its young citizens, whose immaturity, inexperience, and lack of judgment may sometimes impair their ability to exercise their rights wisely.")); *Hutchins,* 942 F.Supp. at 674 (finding that extirpation of juvenile crime and violence and reduction of juvenile victimization constitute compelling state interests).

### b. NARROW TAILORING

The court does not anticipate that the necessary connection between these compelling state interests and the means chosen by the curfew law will be revealed as too attenuated; based on the information before it, the curfew law employs the least restrictive means available.

The Fifth Circuit in *Qutb* concluded that the "distinction based upon age furthers the[ ] objectives [of juvenile crime reduction and juvenile victimization]." 11 F.3d at 493. The Fifth Circuit found that the following data were sufficient to demonstrate the requisite nexus.

> Juvenile crime increases proportionally with age between ten years old and sixteen years old ... In 1989, Dallas recorded 5,160 juvenile arrests, while in 1990 there were 5,425 juvenile arrests. In 1990 there were forty murders, ninety-one sex offenses, 233 robberies, and 230 aggravated assaults committed by juveniles. From January 1991 through April 1991, juveniles were arrested for twenty-one murders, thirty sex offenses, 128 robberies, 107 aggravated assaults, and 1,042 crimes against property. [Murders and rapes are most likely to occur at night in public places, and one-third of robberies occur on streets and highways.]

*Id.*

Responding to the plaintiff's complaints that these statistics were insufficient for their failure to document a nocturnal juvenile crime problem or to show the curfew's effectiveness, the Fifth Circuit stated as follows.

> We will not ... insist upon detailed studies of the precise severity, nature, and characteristics of the juvenile crime problem in analyzing whether the [curfew law] meets constitutional muster when it is conceded that the juvenile crime problem in Dallas constitutes a compelling state interest. In this same vein, the plaintiff['s] arguments that the city has not produced proof of the effectiveness of the ordinance in addressing the juvenile crime problem are unavail-

---

**7.** The curfew law also lists as one of its objectives the solidification of the parent/child relationship. The court need not decide whether this is a significant or compelling state interest (though, if it had to decide, the court would answer in the affirmative), because juvenile crime reduction and protection so obviously are significant and compelling state interests.

ing; indeed, such 'proof' can hardly amount to more than mere speculation. Federal courts have always been reluctant to question the potential effectiveness of legislative remedies designed to address societal problems. As [has been] held in other contexts, [courts] 'do not demand of legislatures scientifically certain criteria of legislation.'

*Id.* at 493 n. 7 (quoting *Ginsberg,* 390 U.S. at 642–43, 88 S.Ct. at 1282).

In addition to determining that the requisite nexus between purpose and classification had been established, *Qutb* concluded that the state had employed the least restrictive methods to achieve its goal, largely because of the exceptions carved out of the law (identical to those provided by the curfew law challenged here).

### i. EVIDENTIARY NEXUS

The only difference between our case and *Qutb* lies in the data; obviously, the statistics considered by the legislature in Dallas are not identical to the materials reviewed by the City of Charlottesville government. Charlottesville's legislative body, before enacting the Curfew Law, held several public hearings and heard arguments and opinions from parents, children, police officers, prosecutors, and other citizens. The City's Police Chief voiced approval for a curfew, because, based on his experience, he believed the curfew would make the City safer. The Chiefs fellow officers concurred. Other Charlottesville residents chimed in, describing late-night disturbances by unruly youth. A principal and school counselor attested that unauthorized nightly wanderings diminished the capacity of children's ability to learn.[8] Finally, a college professor and consultant who is an expert on curfews offered nationwide statistics to back up the City.

Dr. William J. Ruefle provided the following information. Juvenile arrests for serious violent crime increased by 30% between 1986 and 1995; juvenile arrests for property crimes increased by 11%; and juvenile arrests for all other crimes increased by 111%. In 1995, 2.75 million juveniles were arrested. Experts expect such arrests to increase in the future, based on current demographic trends. These national trends hold true for Virginia, where juveniles commit serious violent crimes at a higher rate than adults. Juveniles are also at great risk of being crime victims. Curfews have become a popular and commonly-used tool to battle against such grim statistics by restraining children and placing responsibility on parents; the curfew law in Charlottesville appears to be among the most modest and lenient of the myriad curfew laws implemented nationwide. *See* Affidavit of Dr. William J. Ruefle, Exhibit C–8 of Defendant's Opposition Brief During the hearing held before the court, Dr. Ruefle confirmed that the trends in Charlottesville mirror the nationwide trends; according to Dr. Ruefle, Charlottesville's juvenile crime rate, as well as that in Virginia and in the nation, is on the rise.

Charlottesville's Commonwealth Attorney, Mr. Chapman, reinforced Dr. Ruefle's testimony, explaining that his own experience had taught him that juvenile crime was on the rise in Charlottesville. He provided statistics of juvenile delinquency cases (dating from 1991 to 1996) to back up his assertions. Further, Mr. Chapman testified that even if many crimes take place during the day, the most serious crimes (for instance, ones involving violence and drugs) occur during night time hours.

The information provided by the City thus far adequately demonstrates a nexus between the City's goal-juvenile protection and juvenile crime reduction—and the classification—children under the age of seventeen. In arguing to the contrary, plaintiffs wish to impose improperly stringent standards upon the City. For instance, plaintiffs urge that the City's interests (protection of juveniles and juvenile crime reduction) will not be advanced by the curfew law because there is no evidence that most crimes (by juveniles) are committed at night. But, as discussed

---

**8.** Plaintiffs object to the affidavits of educators that so state because, plaintiffs contend, their attestations do not appear to be based upon personal knowledge. The court, however, is confident that experienced and concerned educators have taken the time to learn the causes for students' poorer performances and are familiar with their students' extra-curricular activities.

above, Mr. Chapman testified that most serious crimes occur at night. Moreover, any person who has lived in the United States and has occasionally read newspapers understands the dangers of night life in all too many of American cities.

In the same vein, as plaintiffs must realize, neither the court nor the City could accept plaintiffs' suggestion that a curfew law with the requisite nexus would apply only to males, would include all ages up to thirty, and would apply between the hours of 7:00 p.m. to 7:00 a.m. *See* Plaintiffs' Memorandum at 21 n. 4. Not only do plaintiffs concede—in the same breath that they suggest this alternative-that their version of the "ideal" curfew law would be unconstitutional, but they also take the extreme position that the *more* intrusive law which would include *adults* would be sufficiently tailored to the goal of preventing harm to and by *juveniles.* Although less extreme, plaintiff's criticism of the law for excluding seventeen year olds—who commit a substantial portion of juvenile offenses-must be rejected. The City made a legislative judgment that the costs of imposing a curfew on seventeen year olds would outweigh any consequent benefits of including them within the curfew. *Cf. Bykofsky,* 401 F.Supp. at 1266 ("Obviously, the older the persons being regulated, the greater the burden on the state to justify the regulation in terms of reasonableness, and there would come an age beyond which a nocturnal curfew could not be constitutionally applied, absent extraordinary or emergency circumstances."). It is not for this court to fault the City for failing to enact an even broader curfew, and the court finds it odd that plaintiffs would take the position that a broader curfew would be more palatable.

Relatedly, plaintiffs' attack upon the statistical information and testimonial evidence offered by the City is unlikely to be fatal to the curfew law. Plaintiffs complain that seventeen year olds are not governed by the curfew law even though they are included in the statistical grouping relied upon by the City. At the hearing, Mr. Chapman indicated that the inclusion of seventeen year olds did not distort the statistics. Next, plaintiffs point out that the statistics relied upon are national, and not specific to the City of Charlottesville. Again, testimony by Dr. Ruefle and Mr. Chapman dilutes the strength of this argument, as both testified that the national statistics accurately reflect Charlottesville's crime problem. Finally, plaintiffs argue that the City's statistics documenting the number of nightly arrests are unhelpful; the number of nightly arrests, so the argument runs, says little of how many crimes are committed at night, because crimes and arrests are not synonymous. This argument is unpersuasive; there may not necessarily be a perfect overlap between crimes and arrests, but one can safely assume that one follows the other in the usual case. Furthermore plaintiffs ignore the testimonial evidence which belies any claim that nightly crime is not a major problem in Charlottesville; there is no constitutional requirement that statistics be adduced to demonstrate a dose nexus between ends and means, and the City's citizens testimony cannot be excluded from the calculus.

More fundamentally, the Supreme Court has rejected the notion that legislatures must produce scientifically exact support for their factual conclusions, and the Fifth Circuit in *Qutb* squarely held that even strict scrutiny analysis does not demand such precision. *See Qutb,* 11 F.3d at 493 n. 7 (quoting *Ginsberg,* 390 U.S. at 642, 88 S.Ct. at 1282). The court agrees with *Qutb* on this point, and finds that the factual support adduced to support Charlottesville's curfew law is at least as persuasive (if not more so) as that proffered by the Dallas legislature.

At this stage the court feels it is appropriate to comment upon the analysis in *Hutchins.* As mentioned above, the district court in *Hutchins* decided that the *Bellow* factors did not dictate different treatment of children and adults in the context of a curfew law and applied strict scrutiny review to the law. The district court purported to distinguish its case from *Qutb* (which also applied strict scrutiny review) because of the statistics adduced by the District of Columbia. With all due respect, the court has trouble seeing any dispositive distinction between the statistics upon which Dallas relied and those upon which the District of Columbia. Not surprisingly, the statistics submitted by the

District of Columbia were imperfect: for instance, they did not indicate which percentage of crimes were committed during night hours, and they included eighteen year olds in their calculations. But such deficiencies, in this court's view, are not of constitutional significance, particularly when the District of Columbia offered the district court a wide array of data from various different sources to support a sadly uncontrovertible fact: the crime rate by juveniles in the District of Columbia is staggering by any definition. *Cf. Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 51–52, 106 S.Ct. 925, 931, 89 L.Ed.2d 29 (1986) (stating that in demonstrating a substantial government interest, a city is "entitled to rely on the experiences of . . . other cities" in enacting an adult theater ordinance, as the First Amendment "does not require a city . . . to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses"); *Steelworkers v. Weber,* 443 U.S. 193, 198 n. 1, 99 S.Ct. 2721, 2725 n. 1, 61 L.Ed.2d 480 (1979) ("Judicial findings of exclusion from crafts on racial grounds are so numerous as to make such exclusion a proper subject for judicial notice."). This court believes the court in *Hutchins* did precisely what it disavowed: it "demanded that[ ] the District [of Columbia] produce 'scientifically certain criteria of legislation.'" 942 F.Supp. at 678 (quoting *Ginsberg,* 390 U.S. at 643, 88 S.Ct. at 1282). The court cannot follow in these footsteps.

### ii. LEAST RESTRICTIVE MEANS

Largely for the same reasons as those given in *Qutb,* the court holds that the least restrictive means were likely used to advance the City's goal. First, the curfew law affects conduct during only four or five hours each night. Second, the curfew law attempts, as best it can without gutting the law, to accommodate the needs of its youth and their

parents.[9] Employment, religious, school, civic, and like activities are essentially exempted. Emergencies and even late-night errands are permitted. Interstate travel and the First Amendment, by the terms of the curfew law, are beyond the scope of the law. And, if a parent wishes—for any reason at all—to venture outside with his or her child after 12:01 a.m. or 1:00 a.m. (as the case may be), the parent may do so; if the child desires a breath of fresh air or has an urge to star-gaze, he or she may do so, with or without the parent, so long as the child remains on a sidewalk adjoining his or her residence.[10]

### iii. SUMMARY

Because the court has found that the curfew law probably will survive strict scrutiny review vis-a-vis the plaintiffs' fundamental right of free movement challenge, the court holds that plaintiffs have not raised serious and substantial questions on the merits of this claim and likely will not prevail on the merits as to this claim.

### 3. PARENTING RIGHTS

The Constitution protects parents against "undue, adverse interference by the State" in child-rearing. *Bellotti,* 443 U.S. at 639 n. 18, 99 S.Ct. at 3046 n. 18 (citing cases); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Plaintiffs insist that the curfew law unconstitutionally usurps parental authority because it constrains a parent's right to authorize a child to go outside during curfew hours at will. Plaintiffs' mistake lies with their interpretation of the word "right," which they seem to take as absolute. But even the most fundamental "right" seldom comes with such

9. The court discusses below plaintiffs' objections (on vagueness grounds) to the exceptions.

10. Plaintiffs contend that they cannot take advantage of these many exceptions because they fear police officers; but this argument suffers from an unacceptable and unsupported assump-

tion that police officers will overstep their proper authority. There is no evidence that police officers will not properly enforce the curfew law, and the court surely will not assume this to be true absent very strong evidence so indicating.

few conditions. The right of parents to raise their children without government incursions is tempered by an important qualification: the government may intrude, so long as the intrusion is not unreasonable. Thus, a parent, no matter how well-intentioned, may not be able to override a child labor law, even for religious purposes, *see Prince,* 321 U.S. at 170, 64 S.Ct. at 444 ("Parents may be free to become martyrs themselves. But it does not follow that they are free, in identical circumstances, to make martyrs of their children . . . ."); may not insist that his or her underage child be sold cigarettes or served alcohol; and may not demand that a state permit his or her fourteen year old to drive. The state has an independent interest in the safety and well-being of children, and, consequently, a parent's desire to raise his or her child in accordance with certain principles cannot always trump state laws. *See Bykofsky,* 401 F.Supp. at 1262–64.

The curfew law harbors no grand scheme to supplant parental authority or governance of children; its ambitions are far more modest. Under its framework parents retain discretion in the majority of cases. As the Fifth Circuit in *Qutb* pointed out, parents can accompany their children outside for whatever reason they wish, and their children are generally permitted to engage in church, school, civic, and like activities. Further, jobs, emergencies, and parental errands qualify as exemptions to the curfew law. Children may exercise their First Amendment rights and may not be prohibited from engaging in interstate travel. The only thing that parents cannot do is authorize their children to go outside when none of these exceptions apply. Such circumstances, undoubtedly, will be rather limited. *See Qutb,* 11 F.3d at 495–96; *Bykofsky,* 401 F.Supp. at 1264. The plaintiffs' affidavits themselves repeatedly emphasize that only on very *rare* occasions do the parents of the juvenile plain-

tiffs allow their children to leave the house after midnight or 1:00 a.m.[11]

In such circumstances where a parent, but for the curfew law, would permit his or her child to attend an all-night "rave" party or to slip out for an unchaperoned midnight soda, no doubt that parent's "right" is restricted. But the restriction is minimal and not one of constitutional significance. This should become particularly apparent when one considers the gravity of the countervailing government interest: preventing children below the age of seventeen from wandering the streets late at night, where they might become victims or perpetrators of crime.[12] The court in *Bykofsky* aptly stated the implications of this analysis.

> Mindful of the fact that the parent's right of control is a qualified right and that the [curfew law] furthers several important governmental interests, including those of keeping juveniles from roaming the streets without adult supervision during the nighttime hours and imposing a duty on parents to know the whereabouts and activities of their children at night, it is clear that the [curfew law] fosters in a constitutional manner the welfare of both minors and the general community. The parents' constitutionally protected interest with respect to the upbringing of their children, upon which the [curfew law] infringes only minimally, is outweighed by [Charlottesville's] interest in protecting immature minors and in controlling and preventing nocturnal juvenile mischief and crime.

*Id.* at 1264.

Based on the foregoing analysis, the court concludes that plaintiffs have not raised serious or substantial questions on the merits of their claim that the rights of parents are unconstitutionally infringed by the curfew law.

---

**11.** Along these lines, the court would be interested to learn whether any churches or synagogues operate during curfew hours and, if so, how often this occurs. Similarly, it would be interesting to tally the frequency of political rallies or gatherings that take place after midnight or 1:00 a.m.

**12.** Contrary to plaintiffs' suggestion, the City of Charlottesville is not necessarily operating under any insulting assumption that children below the age of seventeen are all driven by ill-will or bad motives and that their parents have abdicated parental responsibility. Rather, the City is confronted by a growing crime problem that many citizens simply do not know how to resolve.

4. FIRST AMENDMENT AND VAGUENESS

a. FIRST AMENDMENT

The curfew law specifically exempts First Amendment activities from its reach. It provides that if minors are engaged in First Amendment activities, "such as free exercise of religion, freedom of speech and the right of assembly," § 17–7(b)(8), they are not subject to the strictures of the curfew law. This same exception is the one upon which the Fifth Circuit placed such heavy reliance in sustaining the Dallas curfew law. In *Qutb* the Fifth Circuit referred to the First Amendment exception as the "[m]ost notable" aspect of Dallas's curfew law. Another district court, rejecting a First Amendment challenge to a curfew law, found such a claim "without merit" because of a "bona fide [exception for the] exercise of [f]irst [A]mendment rights," an exception in all pertinent respects identical to the one adopted by Charlottesville. *Bykofsky*, 401 F.Supp. at 1258. Finally, in *Waters v. Barry*, 711 F.Supp. 1125 (D.D.C.1989) (Richey, J.), the court struck down a curfew law, that, "[m]ost importantly, ... [it lacked the type of] broad exemption for the exercise of First Amendment rights [contained in the ordinance upheld by *Bykofsky* ]." *Id.* at 1136 n. 24.

b. VAGUENESS

■ Plaintiffs argue, however, that the First Amendment exception contained in the curfew law is void for vagueness.[13] This

argument is unlikely to prevail.[14] When statutory language is so vague that people of ordinary intelligence "must guess at its meaning and differ as to its application," the law violates fundamental guarantees of due process, "to wit, providing fair warning and notice of what is prohibited ... so that one may act accordingly." *Bykofsky*, 401 F.Supp. at 1248 (citing, *inter alia, Connally v. General Construction Co.*, 269 U.S. 385, 389, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926), *Coates v. City of Cincinnati*, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971)). To give a sense of the doctrine's practical application, the court notes that *Bykofsky* found the following terms and phrases were not void for vagueness: "reasonable necessity," "[u]pon the Mayor's finding of necessity," "necessary night-time activities," "[n]ormal travel," "best interests of ... minors." *Bykofsky*, 401 F.Supp. at 1248–53.

■ Even if a particular legislative enactment is vague, an individual whose conduct is clearly forbidden or permitted by the enactment cannot proceed on a vagueness challenge; only when a statute is vague as to conduct in which an individual claims to engage may he or she raise a vagueness claim. *Parker v. Levy*, 417 U.S. 733, 755–56, 94 S.Ct. 2547, 2561–62, 41 L.Ed.2d 439 (1974). Thus, the question the court must ultimately resolve is whether plaintiffs' activities clearly fall within or beyond the scope of the First Amendment.

13. Plaintiffs also invoke the overbreadth doctrine to challenge the curfew law. The overbreadth doctrine is a "device ... [which] evolved in order to permit one properly charged under a statute to raise the First Amendment rights of others, not charged, whose associational or expressive rights might be chilled by enforcement of overly broad legislation." *Waters v. Barry*, 711 F.Supp. 1125, 1133 (D.D.C.1989). The court agrees with the court in *Waters* that an overbreadth challenge is not appropriate in this context. The curfew law exempts activities protected by the First Amendment; hence, if plaintiffs were to take this exemption at its word, they would have no complaint against the curfew law (at least on First Amendment grounds). Plaintiffs' real concern is that the First Amendment exception is too unclear to be relied upon by minors and insufficient to inform enforcement officials of the type of conduct that is protected.

14. The court notes that plaintiffs' reliance on *CISPES v. FBI*, 770 F.2d 468 (5th Cir.1985), is misplaced. The Fifth Circuit in *CISPES* upheld a statute challenged on First Amendment grounds. In the course of its opinion, the Fifth Circuit noted that an otherwise unconstitutional statute could not be saved by the following provision: "[N]othing contained in this [statute] shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment...." *Id.* at 474. This clause merely restates a constitutional requirement and a rule of construction; hence, it is distinguishable from the First Amendment exception in the City's curfew law, which absolves any minor of liability for violations of the law provided the minor shows he or she was exercising his or her First Amendment rights.

### i. VAGUENESS AND THE FIRST AMENDMENT EXCEPTION

 Most of the activities of which plaintiffs claim they are deprived by the ordinance—snacking, swimming, and ice skating and attending concerts, movies, and parties—clearly do not implicate the First Amendment. As the Supreme Court observed in *Dallas v. Stanglin*, 490 U.S. 19, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989), "'freedom of speech' means more than simply the right to talk and to write. It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *Id.* at 25, 109 S.Ct. at 1595 (holding that meeting at dance halls to socialize is not expressive or intimate association within the meaning of the First Amendment). As plaintiffs emphasize, our First Amendment freedoms are sacred indeed. But it is crucial not to forget, in the rush to assert ones "right," that extending the First Amendment to all activities dilutes the force of the First Amendment and robs us of its most precious gift. Once swimming and drinking soda come within the scope of the First Amendment, by dint of necessity, the First Amendment will mean less and give less; we must carefully guard the First Amendment from becoming sullied by application to claims of this kind.

Even an individual unfamiliar with the Supreme Court's *Stanglin* opinion could not reasonably believe that swimming, ice skating, drinking soda, or attending a "rave" party falls within the scope of the First Amendment. As to these plaintiffs, therefore, the curfew law's First Amendment exception is not vague. Concededly, plaintiffs also occasionally attend City Counsel meetings during curfew hours and participate in theatrical performances, also past curfew hours. These types of activities, particularly the former, are closer to the kinds of freedoms protected by the First Amendment. But plaintiffs need not rely upon the First Amendment exception to engage in such conduct; the curfew law provides an exception for activities sponsored by public or civic organizations.[15]

### ii. CIVIC ORGANIZATION EXCEPTION

 This brings the court to plaintiffs' assault upon the definition "civic," which plaintiffs also decry as unduly vague. Plaintiffs represent that they cannot know whether, for instance, participation in a community theater group qualifies. Although plaintiffs cite a Supreme Court case that found the term to be vague, *see Hynes v. Mayor of Borough of Oradell*, 425 U.S. 610, 621, 96 S.Ct. 1755, 1761, 48 L.Ed.2d 243 (1976) (Burger, C.J.), it must be recalled that the determination is context-specific. Moreover, in *Hynes* the ordinance at issue required "[a]ny person desiring to canvass, solicit or call from house to house ... for a recognized charitable cause ... or political campaign cause ... in writing" to notify the local police department. 425 U.S. at 611, 96 S.Ct. at 1756. Civic organizations were exempted from this requirement. Because the ordinance directly governed speech, the Court held that the statute must meet the "[s]tricter standard[ ] of permissible statutory vagueness [applicable to laws dealing with speech]." *Id.* at 620, 96 S.Ct. at 1760 (internal quotations and citations omitted). In sharp contrast, the Charlottesville curfew law is a content-neutral time, manner, and place restriction which intrudes only minimally upon First Amendment rights; no rational person could believe that the City of Charlottesville hopes to suppress disfavored viewpoints or otherwise censor expression by asking minors to refrain from roaming our city streets at all hours of the night. *Cf. Collins v. Jordan*, 102 F.3d 406, 416 (9th Cir.1996) ("Proclaiming a curfew that requires people to remain at home during certain hours is obviously an entirely different matter from prohibiting only specific First Amendment activities during those or other hours.") (citing *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)).

**15.** The exception requires adult supervision, which the court assumes to be present in theater rehearsals and City Council meetings.

The words surrounding the term "civic" in Charlottesville's curfew law, the law's other provisions, and the general thrust of the curfew law cannot be disregarded, for they inform our analysis as to which organizations qualify as civic. In its context, the court believes that the word civic is not unconstitutionally vague as to the conduct in which plaintiffs engage. The curfew law, quite clearly, does not intend to inhibit activities which take place in the presence of an adult for the betterment of children. Hence, any affiliation with a school, religious organization, or public agency will save an activity scheduled during curfew hours (so long as an adult is present). *See* § 17-7(b)(5). It is assumed, and reasonably so, that even late at night such activities pose minimal danger to children, and, at the same time, help create well-rounded children. The curfew law aims to draw a line between late-night congregations at bars and gatherings that involve entertainment with more expressive components. Of course, the law cannot do so with the elegance of a mathematical equation unless it excludes otherwise eligible organizations. Hence, instead of drawing a clear, bright line that would have given more certainty-but would have excluded "deserving" activities—the City chose to rely upon terminology that offers more flexibility to children. After providing examples of organizations that qualify—schools, religious organizations, public agencies—the curfew law included within the scope of the permissible activities those sponsored by "like" organizations and civic organizations. Reference to the dictionary reinforces the import of the preceding discussion. Civic is defined, *inter alia,* as something that "contribut[es] to general welfare and the betterment of life for the citizenry of a community or enhancement of its facilities, [especially activity] devoted to improving ... recreation." Webster's Third New International Dictionary (Unabridged) 412 (1961). Although on the margins, individuals of ordinary intelligence may differ as to what qualifies under this definition, the term "civic" in the context of the curfew law is sufficiently understandable in the normal case (for instance, participation in theater) so as to survive a constitutional challenge based on vagueness.

### iii. EMERGENCY EXCEPTION

Plaintiffs' final claim of vagueness is of little weight. If accepted by a court of law, it would be plainly scary, for most statutes would be invalidated and legislatures would be forced to start authoring encyclopedic laws. Somehow, plaintiffs find vagueness in the term "emergency," defined as a situation "requiring immediate action to safeguard life, limb or property," including "fires, natural disasters, automobile accidents, or other similar circumstances." § 17-7(a). In their memorandum, plaintiffs query, does this include a run to the convenience store for a band-aid? Plaintiffs' Memorandum at 28. The court can only assume plaintiffs are, in this context, being facetious.

Based on the above discussion, the court concludes that plaintiffs' challenge to the curfew law based on vagueness will likely fail.

### 5. FOURTH AMENDMENT

 Although the court in *Waters,* 711 F.Supp. at 1137-38, invalidated a curfew law applicable to minors, it rejected the same arguments plaintiffs in this case make in connection with their Fourth Amendment claim. The court is persuaded by this portion of the *Waters* opinion, and, in addressing plaintiffs' Fourth Amendment claim, quotes the insightful reasoning of Judge Richey.

The plaintiffs challenge on Fourth Amendment grounds those provisions of the [curfew law] which permit the arrest and detention of juveniles if they are unable to document: (1) that they are properly on the street during the curfew period, or (2) that they are older than [17] years of age. The plaintiffs contend that the [curfew law], by permitting such arrests and detentions, "repeals pro tanto the Fourth Amendment's protection of [juveniles], for ordinarily the police cannot constitutionally demand, on pain of arrest and detention, that a person whose behavior is in no way suspicious stop and provide identification." The plaintiffs argue that the Act "authorizes massive and utterly groundless seizures of young adults ..." The [c]ourt disagrees. The plaintiffs' argument reflects, in essence, an attempt to find in the

Fourth Amendment an absolute right to be free from searches and seizures, a right that cannot be limited by the government's power to criminalize certain forms of behavior. The [c]ourt finds no such absolute right in the Fourth Amendment. Instead, as the very language of the Fourth Amendment provides, a right to be free from such intrusions exists only so long as there is not probable cause to believe that an offense has been committed. Here, the [City] has attempted to criminalize the public presence of juveniles during the curfew hours.... The proscriptions of the [curfew law] ... provide ... valid substantive references for determining the presence or absence of probable cause in a given case. Although the purported crime is utterly simple—nocturnal, public youth-that simplicity causes the type of proof required to justify a search or seizure to be similarly uncomplex. Thus, were a police officer to reasonably conclude that an individual looked "young"—that he or she looked like a minor—the officer would have "probable cause" to believe that the individual was engaged in an illegal act, i.e., being on the streets during the curfew period. If the individual could not prove that he or she was over [17], or that he or she fell within one of the [curfew law's] other exceptions, the officer would be entitled to place the individual under arrest. So long as the officer could reasonably have believed that the individual looked "young," the search, seizure or arrest would take place on the basis of probable cause and no Fourth Amendment violation would occur.

*Id.* at 1137–38 (footnotes omitted).

With Judge Richey the court concludes that a curfew law, simply because it prohibits unauthorized public presence on the streets by minors does not, on its face, violate the Fourth Amendment.

## 6. EQUAL PROTECTION CLAUSE

■ The principle of equal protection demands (with deceptive simplicity) that all persons who are similarly situated be treated alike. *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249,

3254, 87 L.Ed.2d 313 (1985). Plaintiffs contend the curfew law violates the Equal Protection Clause of the Fourteenth Amendment because it distinguishes between individuals below the age of seventeen and individuals of that age and older. Age is not a suspect class, *see Gregory v. Ashcroft,* 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), and, consequently, the rational basis test applies. The curfew law meets through this standard, for to uphold the law the court need only find that (1) there is a reasonable basis for distinguishing between individuals under the age of seventeen and those above that age, and (2) the relationship between ends and means is rational. As should be apparent from the court's discussion above, the court believes the curfew law satisfies both criteria.

Minors and adults differ in significant respects, and our laws frequently deny to one group what they give freely to the other. That the line is drawn to exclude seventeen year olds gives the court no pause; the legislature must choose some cut off point, and it is certainly not arbitrary to conclude that seventeen year olds, in the context of a curfew law, are more like adults than like minors. Such inquiry, in any event, is properly left in the legislative realm. Also relegated to elected officials is the question whether the means chosen are the best way to advance their chosen ends, so long as the ends are legitimate, and the means reasonably advance those ends. The ends of the curfew law—to decrease juvenile crime and protect children-clearly and indisputably are legitimate. The means chosen by the City of Charlottesville—limiting the instances in which minors may roam the streets—reasonably advance the purpose of the curfew law.

This conclusion puts an end to the court's examination of the curfew law on equal protection grounds.

## B. IRREPARABLE INJURY TO PLAINTIFFS, HARM TO DEFENDANT, AND THE PUBLIC INTEREST

Given the court's conclusion that plaintiffs have not raised serious and substantial questions on their claims (and are unlikely to prevail on the merits of their claims), the

court need not consider the remaining *Black-welder* factors (irreparable injury, harm to defendant, and the public interest), because preliminary injunctive relief is only appropriate when, at the very least, there has been a showing that the merits of the claims raised ultimately have some serious chance of success. Nevertheless, the court will consider these factors, which only reinforce its conclusion that preliminary injunctive relief should not issue.

## 1. IRREPARABLE INJURY TO PLAINTIFFS

■ The curfew law does not directly regulate speech, but rather is aimed at conduct only. It is a content-neutral time, place, and manner restriction. This point is bolstered by plaintiffs' affidavits, none of which contain any allegation that their rights to free speech are being abridged. That minors cannot attend "rave" parties, ice skate, or drink soda during four or five hours each night cannot qualify as irreparable injury, even if it is a nuisance for a minor to confine such socializing to earlier hours. That the parents of minors cannot permit their children to engage in such activities without their supervision likewise does not qualify as irreparable injury. Accordingly, the court finds that plaintiffs will suffer no irreparable injury if the curfew law is not enjoined from operation.

## 2. HARM TO DEFENDANT

■ The City of Charlottesville presented testimonial evidence that it would be harmed if the court were to halt enforcement of the curfew law. Mr. Chapman explained that children and parents in Charlottesville have begun to accept the curfew law, and a sudden reversal of the law would result in a loss of momentum and would send an undesirable message to children—that roaming the streets at night is not only appropriate, but also a "right." More concretely, a child could suffer bodily injury or inflict such injury on another as a direct result of a suspension of the curfew law. Of course, even one incident of violence suffered by an innocent human being constitutes tremendous harm to that individual and society at large. There-

fore, the court finds that defendant would likely be harmed were the court to grant plaintiffs' motion for preliminary injunctive relief.

## 3. PUBLIC INTEREST

■ The public interest cuts in favor of the City. Nationally and in the Metro area, the number of juveniles charged with violent crimes, aggravated assaults, gun offenses, rape, sex offenses, larceny, auto theft, and drug-related crimes, is staggering by all accounts; nor do juveniles, who are also victims of such crimes, escape unscathed. *See* Pierre Thomas & John Fountain, *Drug Arrests of Juveniles Rise Sharply; Local, National Trend Contrasts to Decrease in Overall Crime Rate*, Wash. Post, Dec. 26, 1996, at A1; Kathryn Wexler, *Juvenile Arrests Are on the Rise*, Wash. Post, June 20, 1996, at M1; Pierre Thomas, *Arrests Soar for Violent Crime by Juveniles*, Wash. Post, Sept. 8, 1995, at A1; Eric L. Wee, *Violent Crime Continues to Increase Among Youths*, Wash. Post, Mar. 30,1995, at V1; Nancy Lewis, *Court Cases Reveal Arms Buildup Among D.C. Youths*, Wash. Post, Jan. 1, 1995, at A1; Cindy Loose & Pierre Thomas, *'Crisis of Violence' Becoming Menace to Childhood*, Wash. Post, Jan. 2, 1994, at A1; DeNeen L. Brown, *Sex Offenses by Juveniles Rise in Area*, Wash. Post, Mar. 9, 1992, at D1. One would be quixotic to believe that a curfew law alone could reverse these frightening trends or cure the ills that cause them. But it may contribute in some manner, however small, and the judiciary has a responsibility not to tie the hands of our local governments unless very good cause supports such interference. Moreover, it appears that curfew laws have done some good. *See* Professor Dan M. Kahan, *Curfews Free Juveniles*, Wash. Post, Nov. 14, 1996, at A21 (criticizing *Hutchins* and citing drops in crime in cities that have adopted curfews). Dan M. Kahan, a professor of constitutional and criminal law at the University of Chicago, points out the irony in challenges such as that brought by plaintiffs: apparently, there is evidence that "70 percent of [black] teenagers in the District [of Columbia] support[ ] a nighttime curfew[, and i]nner-city parents-on whose behalf the ACLU often purports to speak when it at-

tacks curfews—are frequently among the strongest supporters of these laws." *Id.*

Meanwhile, the court has found that the First Amendment and other precious constitutional freedoms guaranteed our citizens are probably not implicated by the curfew law. Aside from all the reasons the court has already listed to support this conclusion, stark reality cannot be ignored. Children under the age of seventeen generally do not wish to escape their homes after midnight to go to church (which the curfew law permits) or to attend a political rally (which the curfew law also permits).[16] Instead, plaintiffs likely view as a burden the need to return early from a movie or a social event; the court agrees that the curfew law may be a nuisance, particularly to well-adjusted children who are careful and have no intention of committing crime. But, as Justice Holmes reminded us, most laws prohibit conduct in which men wish to engage. *See Adkins v. Children's Hosp.*, 261 U.S. 525, 568, 43 S.Ct. 394, 405, 67 L.Ed. 785 (1923) (Holmes, J., dissenting) ("But pretty much all law consists in forbidding men to do some things that they want to do . . . ."). If it were otherwise, there would be little need for laws. Yet, for the reasons already discussed, there is a need for the curfew law.

All these reasons lead the court to conclude that plaintiffs' request for a preliminary injunction must be denied.

An appropriate Order shall this day issue.

---

**16.** By no means does the court suggest that First Amendment protection extends only to political rallies and attendance at church.